Nate STEIN, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 18937.

United States Court of Appeals
Ninth Circuit.

Aug. 28, 1964.

Rehearing Denied Oct. 29, 1964.

Russell E. Parsons, Edward I. Gritz, Los Angeles, Cal., for appellant.

Francis C. Whelan, U. S. Atty., Thomas R. Sheridan, Asst. U. S. Atty.,

Chief, Criminal Section, Los Angeles, Cal., for appellee.

Before CHAMBERS and BARNES, Circuit Judges, and McNICHOLS, District Judge.

BARNES, Circuit Judge:

This is an appeal from appellant's conviction on all four counts of a four count indictment. He was convicted on Count I of subornation of perjury in inducing one Joel Benton to testify falsely [1] be-

1. The first count specified the perjury allegedly induced as follows:

"[I]n that he induced and suborned one Joel Benton to knowingly commit perjury, in that Benton, on June 27, 1958, having taken an oath before competent officers, namely, United States General Accounting Office Investigators for the United States Senate Select Committee on improper activities in the labor or management field, and a Notary Public in a matter in which a law of the United States (2 U.S.C. 191; 31 U.S.C. 53, 117) authorizes an oath to be administered that he would depose and certify truly that written testimony, declaration and deposition subscribed by him was true. Contrary to said oath, he subscribed a matter which he did not believe to be true, and such matter was material to the above said Senate Committee's investigation. And, on or about July 27, 1958, in Los Angeles, the said Benton gave the said investigators an affidavit in which he incorporated by specific reference and attachment a prior written statement he had provided to said investigators on June 8, 1958, which was filed with and made a part of the official transcript of the said Senate Committee (Exhibit 168, Part 40, pp. 15,001–15,003) on September 15, 1958, and in said affidavit the following perjurious matter was found:

"(a) 'That during the period from the latter part of 1955 to June 1956, he received a total sum of $4400.00 from the Teamsters Union for a survey personally made by him of the commercial trucking operations between Los Angeles and San Francisco.' That said testimony was false and contrary to his oath, and both Benton and defendant Nate Stein then and there well knew and believed in that the $4400.00 was not received by Benton for such a survey, and that Benton never made such a survey.

"(b) 'I further swear that none of the amount noted above, namely, $4400.00, was shared with any person connected in any way with the Teamsters Union.' That testimony was false and contrary to the said oath taken by Benton, as both Benton and Stein then and there well knew, and that at least some of the $4400.00 was shared with the defendant Nate Stein, a person connected in some way with the Teamsters Union.

"(c) 'Nate Stein allegedly told Benton that his friend Jimmy Hoffa wanted a confidential count made of trucks operating between San Francisco and Los Angeles; that presumably he was to have gotten someone to help make a 24-hour day count on both the Coast and Inland routes, but he did it himself. He spent two Friday nights and two Saturday nights at Gorman and Santa Barbara. The number of trucks going each way every 24 hours was approximately 800. He made his report to Stein, and some time later Stein gave him a check in the amount of $900.00.' It is alleged that said testimony was false and contrary to the oath taken by Benton, and that it was so known by Benton and Stein. Benton did not report to defendant Stein, and the $900.00 check was not in payment of Benton's services.

"(d) 'Early in January or February of 1956, he was commissioned to repeat his truck counting. He did this as before. Upon completion of his assignment, he received a check through the mail for $1,000.00.' Said testimony was false and contrary to the oath taken by Benton; that Benton and defendant Stein then and there knew and believed that Benton received no such commission. Benton did not count the trucks, and Benton did not receive the $1,000.00 check through the mails.

"(e) 'Some two months later, he received another check for $1,000.00 in the same manner for doing the same work. Said testimony was false and untrue, which Benton and Stein well knew and believed, and knew that Benton did not receive this check for the counting of trucks.'

"(f) 'That Benton was asked by Stein to dream up some type of public relations program which would create a more favorable image in the public mind. After some time, he came up with an idea, a weekly one-half hour television show. He presented this idea to Stein; Stein read over the idea and said it might have some merit. Some time later, Stein handed him a check for $1,500.00, in June, 1956, with the remark, "Somebody liked your show idea." He took that to mean the extra $500.00 was because he

fore a committee of the United States Senate (18 U.S.C. § 1622); [2] in Count II of corruptly influencing Benton to so testify falsely (18 U.S.C. § 1505); [3] in Count III of corruptly influencing Benton to give false and perjurious information to investigators of the committee (18 U.S.C. § 1505); and in Count IV of willful income tax evasion in 1956 by failure to report the same $3,500 involved in the other counts (26 U.S.C. § 7203).[4]

Sentences on Counts I, II and III of three years confinement, to be served concurrently, were imposed. On Count IV appellant was granted three years probation.

■ The sole legal question raised on this appeal is the sufficiency of the evidence to prove the crimes charged. By reason of the concurrent sentences, we need find but one of the first three counts supported by substantial evidence to affirm the conviction on all three. Sinclair v. United States, 1929, 279 U.S. 263, 49 S.Ct. 268, 73 L.Ed. 692; Byrnes v. United States, 9 Cir. 1964, 327 F.2d 825, 830.

■ On this appeal, of course, we must view the facts in the most favorable light to sustain the judgment below. Glasser v. United States, 1942, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680. Mosco

---

had counted trucks exactly as before the latter part of May. This was the last work he did for Stein, the last check he received.' Said testimony was false and contrary to the oath taken by Benton, and both Benton and Stein knew it to be false. Benton did not originate an idea for a weekly one-half hour television show and give it to Stein; Benton did not again count trucks, and the $1,500.00 was not for Benton's truck counting, and it was not for Benton's idea for union public relations."
(Quoted from Appellant's Brief, pp. 2–5.)

2. 18 U.S.C. § 1622 reads:
"§ 1622. Subornation of perjury. Whoever procures another to commit any perjury is guilty of subornation of perjury, and shall be fined not more than $2,000 or imprisoned not more than five years, or both."

3. 18 U.S.C. § 1505, since amended, read at the time this crime allegedly occurred:
"§ 1505. Influencing or injuring witness before agencies and committees. Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any witness in any proceeding pending before any department or agency of the United States, or in connection with any inquiry or investigation being had by either House, or any committee of either House, or any joint committee of the Congress; or
"Whoever injures any part or witness in his person or property on account of his attending or having attended such proceeding, inquiry, or investigation, or on account of his testifying or having

testified to any matter pending therein, or;
"Whoever corruptly, or by threats or force, or by any threatening letter or communication influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede the due and proper administration of the law under which such proceeding is being had before such department or agency of the United States, or the due and proper exercise of the power of inquiry under which such inquiry or investigation is being had by either House, or any committee of either House or any joint committee of the Congress—
"Shall be fined not more than $5,000 or imprisoned not more than five years, or both."
This statute was amended in 1962, but has no effect on this prosecution.

4. 26 U.S.C. § 7203 reads:
"§ 7203. Willful failure to file return, supply information, or pay tax. Any person required under this title to pay any estimated tax or tax, or required by this title or by regulations made under authority thereof to make a return (other than a return required under authority of section 6015 or section 6016), keep any records, or supply any information, who willfully fails to pay such estimated tax or tax, make such return, keep such records, or supply such information, at the time or times required by law or regulations, shall, in addition to other penalties provided by law, be guilty of a misdemeanor and, upon conviction thereof, shall be fined not more than $10,000, or imprisoned not more than 1 year, or both, together with the costs of prosecution."

v. United States, 9 Cir. 1962, 301 F.2d 180, 181, cert. den. 371 U.S. 842, 83 S. Ct. 72, 9 L.Ed.2d 78.

We therefore adopt the government's statement of the facts, as appears in the margin.[5]

5. "2. *Chronological Order of Facts.*

"In early 1955 appellant met Joel Benton at the latter's office in Los Angeles, California. Prior to this meeting appellant knew and had done some work for James R. Hoffa of the Teamsters Union and was paid $756.87. During 1955 appellant continued his financial relationship with James R. Hoffa and the Teamster's Union, and on March 23, 1955 was paid $1500 by a check drawn on Local 299, Detroit, Michigan, which was endorsed 'reimbursement for Expenses.' Also during 1955 appellant worked for Teamster's Local Union No. 41, Kansas City, Missouri, for which he was paid by said Local in four checks as follows:

| | |
|---|---|
| Oct. 10, 1955 | —$500 'Expenses—Public Relations'; |
| Nov. 4, 1955 | —$406.21 'Room for Nate Stein—Public Relations'; |
| Nov. 23, 1955 | —$500 'Labor Relations Final—In Full'; |
| Dec. 12, 1955 | —$616.19 'Room for Nate Stein Public Relations'. |

(Exs. 3, 4, 6 and 7)

"In the fall of 1955 appellant went to Joel Benton in Los Angeles, California, and asked Benton if Benton would do him a favor. Benton said, 'Yes.' Appellant then advised Benton that he, appellant, was expecting to get a check in the near future, and that since he didn't have a bank account or social security number he would have no way of cashing the check, and would Benton cash it for him. Benton agreed. Shortly thereafter appellant again went to Benton in Los Angeles, California and handed him a check [Ex. 5] dated November 1, 1955, payable to Joel Benton and Associates in the amount of $900, and made by Local 41, Kansas City, Missouri. Benton took this check to his bank where he maintained a checking account in his name and, in appellant's presence, Benton endorsed the check and presented it for encashment. The bank refused to cash it as they had no account for Joel Benton and Associates (which was nothing more than a letterhead), and Benton returned the check to appellant. The check was then cashed at Schwabs Pharmacy on December 22, 1955. Later that day, appellant telephoned Benton and requested that Benton report the $900 as his income on his income tax return and appellant would reimburse him for the taxes paid on it; this was in fact done. This is one of the four crucial checks. The check itself is dated November 1, 1955 and the '1' is clearly typed over a '4.' The stub of the check is dated November 4, 1955 and bears this legend: 'For Public Relations work by Nate Stein—30 days.'

"This check was issued during the period that appellant was working in Kansas City, Missouri.

"All the checks issued by Local 41, Kansas City, Missouri, were signed by Roy L. Williams and Floyd R. Hayes, both of whom testified that: they never met Joel Benton, they never hired Joel Benton, they knew appellant, appellant was doing public relations work for their Local, for which he was paid, they never hired anyone to make a survey of piggy-back truck operations, and the $900 check payable to Joel Benton and Associates was not for Joel Benton and was not for counting piggy-back operations in California.

"Appellant, on cross-examination, contradicted himself so many ways and so many times that it is difficult to ascertain his contention on this subject matter, but it appears that he claims that James R. Hoffa told him it was all right to have the $900 check of Local 41 made payable to Joel Benton, even though Hoffa had nothing to do with any checks issued by Local 41.

"In 1956, on three separate occasions, appellant went to Joel Benton and asked him to endorse a check. Each of these checks was issued by Teamster Local 299 Detroit Michigan, signed by James R. Hoffa and Frank Collins, and payable to Joel Benton. The checks were for $1000, $1000, and $1500. The stub for each of these checks indicates that the purpose of the check was for: 'advertising $1000.00' 'advertising $1000.00 Re James R. Hoffa Testimonial Dinner,' and 'Advertising $1500.00 and Services Ren-

To sustain the conviction under Count I for subornation of perjury, the "two witness rule" applies. That is, to show that perjury was actually committed, either two witnesses must so testify, or one witness' testimony to that

dered.' For each check issued there is a voucher on Joel Benton and Associates letterhead that corresponds with a check and is stamped 'Paid,' and these indicate that the purpose of these checks was 'Services rendered $1000.00 for advertising—James R. Hoffa's dinner'; 'Services rendered $1000.00 Advertising & Publicity Expenses in connection the James R. Hoffa testimonial dinner'; and 'Advertising and Services Rendered $1500.00.' On each occasion Joel Benton endorsed the check, returned it to appellant, never saw it again, and never received any of the proceeds. Each of these checks was cashed at Schwabs Pharmacy in Los Angeles, California.

"In early 1957 appellant telephoned Joel Benton and requested that Benton report the $3500.00 (total of the three checks) on Benton's income tax return, and appellant would reimburse him for the taxes paid on said amount. Benton reported the $3500 as his income and appellant reimbursed Benton $485 for the taxes Benton estimated he had paid on the four checks.

"During 1956 appellant performed services for James R. Hoffa and for Hoffa's Local 299, for which appellant was at least reimbursed by checks drawn on Local 299. These services performed by appellant included: working on Hoffa's testimonial dinner in Detroit, Michigan, obtaining certain supplies, and travelling to Israel with Hoffa.

"All of the checks issued by Local 299, Detroit, Michigan, were signed by James R. Hoffa (by machine) and by Frank Collins, both of whom testified that: they had known appellant since at least 1954; that appellant had performed services for which he was reimbursed by checks drawn on Local 299; they did not know Joel Benton; they did not hire Joel Benton for anything including advertising work or for work in regards to Hoffa's testimonial dinner; and that appellant had worked on Hoffa's testimonial dinner in Detroit, Michigan, in 1956.

"Hoffa also testified that the three checks of Local 299, Detroit, Michigan, payable to Joel Benton and totaling $3500.00 were in part for public relations work done by appellant and in part for appellant's work in counting piggy-back trucks running on the west coast. Hoffa had no recollection of Benton doing any work on the truck count or of Stein discussing Benton with him.

"On January 30, 1957, the First Session of the 85th Congress passed Senate Resolution 74, which provides as follows:

" 'Resolved, That there is hereby established a select committee which is authorized and directed to conduct an investigation and study of the extent to which criminal or other improper practices or activities are, or have been engaged in in the field of labor-management relations or in groups or organizations of employees or employers to the deriment of the interests of the public employers or employees, and to determine whether any changes are required in the laws of the United States in order to protect such interests against the occurrence of such practices or activities.'

"This resolution established the Senate's Select Committee on Improper Activities in the Labor or Management Field, which was commonly referred to as The McClellan Committee.

"At the opening of the hearings before this Committee, the Chairman, Senator John L. McClellan, set forth the purposes of the Committee's investigation in some detail. (Hearings before the Select Committee on Improper Activities in the Labor or Management Field, Part 1.)

"Additional Senate Resolutions continued this Committee in operation for all times pertinent to this case. (See: Senate Resolution 221, 85th Congress, 2nd Session.)

"On January 20, 1958 this Committee issued a subpoena for the appellant to appear before the Committee; and on April 11, 1958, in Los Angeles, California. This subpoena was served upon the appellant. (On September 11, 1958, appellant appeared before said Committee and was sworn and testified.) (Hearings before the Select Committee on Improper Activities in the Labor or Management Field, 85th Congress, Second Session, Part 40, pp. 14986–14992.)

"After appellant had been subpoenaed but before appellant appeared to testify pursuant to his subpoena, he contacted Joel Benton and said: 'I hope you declared the $4,400 in checks, because there is a big investigation going on and you may be contacted by the federal men.' They then arranged to and did meet in a Los Angeles, California, restaurant, at which time appellant told Benton, 'that there was a big investiga-

effect must be corroborated by other evidence. Catrino v. United States, 9 Cir. 1949, 176 F.2d 884, 888; Weiler v. United States, 1945, 323 U.S. 606, 65 S.Ct. 548, 89 L.Ed. 495; Hammer v. United States, 1926, 271 U.S. 620, 46 S.Ct. 603,.

tion going on, that (he) might be contacted, and that if (he) did that (he) should have a story ready to tell the investigators to account for this money.' Appellant further told Benton that if he was contacted he was to tell them that he had made a confidential truck count on both Highway 99 and Highway 101 for the purpose of finding out how many trucks travel over these two routes during the course of a 24-hour day. Benton agreed to tell such a story and asked appellant for the number of trucks he should say had travelled over these highways. Appellant said he would get such information and give it to Benton. A day or so later appellant furnished Benton with this information. There were additional conversations between appellant and Benton during this period, and once Benton questioned the plausibility of the story he was to tell about getting $900, then $1000, then another $1000 and finally $1500, for a total of $4400, for counting trucks. Appellant then told Benton to come up with some kind of a TV idea which might be used for national broadcasting purposes extolling the virtues of unions. Benton then (in 1958, two years after the money was paid) spent half an hour composing an outline for a TV show.

"At the end of May 1958 and during June 1958, Walter L. Malone, an investigator with the United States General Accounting Office assigned to the McClellan Committee, on behalf of said Committee, had a series of contacts with Joel Benton. On June 6, 1958, Malone interviewed Benton in Los Angeles, California, and requested information regarding appellant and the four checks totalling $4400. At Malone's request, Benton, on June 8, 1958, wrote out the information Malone requested and turned it over to Malone the next day. Benton gave a copy of this statement to appellant. Malone sent this seven-page handwritten statement to the McClellan Committee.

"On June 26, 1958 Malone served a Committee subpoena upon Benton. On June 27, 1958 Malone, accompanied by another similar investigator, interviewed Benton, took a statement from Benton, took Benton before a notary public where Benton was sworn and signed the statement. This statement specifically incorporated the prior seven-page statement of Benton, and Benton swore that all statements made therein were true and correct. This sworn statement or affidavit of Benton's was then sent to the McClellan Committee, and on September 15, 1958, while James R. Hoffa was testifying before said Committee, this affidavit was read into the record.

"During this period that Benton was being contacted by the investigators, Benton and appellant were in contact with each other. In fact, Benton gave a copy of his June 8, 1958 statement to appellant and a copy to Marvin Cole, Benton's employer at the time.

"In Benton's affidavit Benton swore to the following things:

"A. '* * * that during the period from the latter part of 1955 to June 1956 (I) received the total sum of $4,400 from the Teamsters Union for a survey personally made by me of the commercial trucking operations between Los Angeles and San Francisco, California.'

"B. 'I further swear that none of the amount noted above ($4,400) was shared with any person connected in any way with the Teamsters Union.'

"C. '* * * he (Nate Stein) told me his friend Jimmy Hoffa wanted a confidential count made of trucks operating between San Francisco and Los Angeles on both the Coast and inland routes. * * * I accepted the assignment. Presumably I was to have gotten someone to help me make a 24-hour a day count on both routes simultaneously but instead I did it myself. I sent 2 Friday nights and 2 Saturday days at both Gorman and Santa Barbara. As I recall the combined number of trucks going each way every 24 hours was approximately 800. I made my report to Nate and some time later he gave me a check in the amount of $900.'

"D. 'Very early in 1956, either January or February I think, I was commissioned to repeat my truck counting. I did this exactly as I had done before in both Gorman and Santa Barbara. On completion of my assignment I received a check through the mail at my office for $1000. No letter, note, or other material was enclosed.'

"E. 'Approximately two months later I received another check for $1000 in exactly the same way for doing exactly the same work.'

"F. 'Meanwhile Nate asked me if I could dream up some type of public relations program which would

70 L.Ed. 1118. But the two witness requirement is not applicable in showing that perjury was induced by the defendant. Catrino v. United States, supra 176 F.2d at 888.

 Nor is the two witness rule applicable in showing that the defendant obstructed justice under 18 U.S.C. § 1505 by influencing a witness to give false testimony and information to a Senate Committee and its investigators. Catrino v. United States, supra 176 F.2d at 888.[6] Thus, the testimony of one person alone is sufficient to convict the defendant of obstructing justice under 18 U.S.C. § 1505 (Count II—influencing Benton to give false testimony to the Senate Committee), and giving false and perjurious information to the committee investigators (Count III). We hold that the

creat a more favorable Union image in the public's mind. After thinking about it for a few days I came up with an idea for a weekly (sic) this idea just about as sketchily as I have here (sic) ½ hour television show. * * * I presented to Nate. * * * Nate read over the idea and said it might have some merit and that's the last I heard of it till he handed me a check for $1500 in June of 1956 with the remark that "maybe somebody liked your show idea." I took that to mean the extra $500 because I had again counted trucks exactly as before the latter part of May. This was the last work I did for Nate and the last check I received.'

"The above-quoted excerpts were specifically charged in Count One of the indictment as being perjurious.

"Joel Benton testified that each of these statements quoted above was knowingly made by him under oath, and at the time he made them that he knew that they were false and contrary to the oath he had taken.

"Joel Benton further testified that appellant told him what to say regarding the purpose and handling of the four checks totaling $4400. Benton testified, in essence, that he committed perjury because appellant told him to and he was afraid of appellant. (The Government made an offer of proof regarding the basis for the witness' fear, but the trial court ruled that its prejudicial effect outweighed its probative value.)

"The four critical checks totaling $4400 were cashed at Schwabs Pharmacy in Los Angeles, California, without bearing appellant's endorsement. Benton testified he did not know the personnel at Schwabs and he never cashed a check at Schwabs. The personnel at Schwabs testified: that they did not know Benton and would not have cashed a substantial check for Benton alone; and that they had known appellant for many years, and over the years had cashed many checks for him.

"It must be noted that the last of the four crucial checks when compared with another check is most revealing. [Exhibits 18 and 16, respectively.] Exhibit 16 is check No. 2065, payable to Nate Stein, and in the amount of $156.60. Exhibit 18 is check No. 2066, payable to Joel Benton, and in the amount of $1500.00. Both of these checks: were made by Local 299, Detroit, Michigan, signed by James R. Hoffa and Frank Collins, dated June 21, 1956, and cashed at Schwabs Pharmacy in Los Angeles, California, on July 6, 1956.

"An examination of all of the check exhibits, including those issued to and cashed by appellant and never handled by Benton, show the following pattern: the checks were all folded into fourths, and the checks were not cashed for some time after they were issued. Appellant even admitted folding his checks.

"Three checks were issued by Mr. Feldman, dated September 5, 1956, September 15, 1956, and October 8, 1956, payable to appellant, and in the following amounts: "$1,000, $580, and $1,000. The check numbers run consecutively, and all three checks were cashed on October 8, 1956 at Schwabs.

"In June of 1962 when the federal grand jury was investigating Joseph 'Doc' Stacher and then Marvin Cole (Benton's former employer), Benton was subpoenaed before the grand jury. Benton then voluntarily came to the Government and told his story. Benton himself was not under investigation at the time nor was he awaiting trial." See also: Cole v. United States, 9 Cir. 1964, 329 F.2d 437.

(Quoted from Appellee's Brief, p. 8–18.)

6. Decided as to 18 U.S.C. § 1503. We see no reason why the same rule would not be applicable to cases arising under 18 U.S.C. § 1505.

following evidence was sufficient to sustain the conviction of Stein on both Counts II and III:

(a) The testimony of Benton himself;

(b) Ex. 44—the subpoena of January 20, 1958;

(c) Ex. 30—the statement of Benton, dated July 6, 1962;

(d) Stipulation No. 2, reciting that Exhibits 24 and 25 were read into evidence before the committee;

(e) a fair and careful reading of defendant Stein's own testimony.

And, more particularly as to Count I, there exists the following corroboration:

(f) Exhibits 45 and 47—the affidavits of Hornada and Bernard Schwab, respectively;

(g) the testimony of Hornada and of Schwab;

(h) the testimony of Williams and Hayes;

(i) the testimony of Hoffa and Collins;

(j) Exhibits 5, 8, 10 and 18—the four checks totalling $4,400;

(k) Exhibits 5 and 26A—the stubs for these four checks; and

(l) Exhibits 9, 11 and 19—the vouchers for three of the checks.

▮ We hold that the testimony of Benton to the effect that the testimony he gave to the committee was false was adequately corroborated by the evidence listed above from (f) to (l), inclusive, to satisfy the two witness rule and thus sustain the conviction on Count I. There can be no question that the jury was justified in concluding that Stein knew that the testimony was false and that Stein induced Benton to give it to the committee.

Appellant urges, however, that Benton was not a "witness," citing Berra v. United States, 8 Cir. 1955, 221 F.2d 590, affirmed 351 U.S. 131, 76 S.Ct. 685, 100 L.Ed. 1013. There, in an income tax case, Berra was accused of obstructing justice by influencing one Schmidt to

destroy records. This was almost one month before Schmidt first met with investigating revenue agents, and two months before Schmidt was served with a subpoena. Thus Schmidt was not only not a witness under subpoena; he was at the time in question not even a *probable* witness. We may assume he might be classified as a *possible* witness; at least in the defendant's eyes. (221 F.2d at 596) But no proof that he then *intended* to testify existed.

Here, appellant knew Benton was a probable witness; Stein had contacted Benton in 1957 to be sure Benton reported the proceeds of the checks in his 1956 income tax return. Stein contacted Benton early in 1958 to tell him about the McClellan Committee investigation, and to warn him he (Benton) might be contacted by federal men. Stein gave Benton the false story to tell when and if he testified—and for no other purpose! Stein later obtained and suggested the specific number of trucks Benton was falsely to report he had seen and counted. He had Benton, two years after the event, invent the phony television show format.

When Stein contacted Benton in 1958, he (Stein) had already been subpoenaed to testify before the committee. He knew then that Benton might be called upon to testify, under oath, as to why Benton cashed these checks. At that time Stein knew the story he told Benton to tell the investigators was false.

Benton did intend to help Stein by giving such testimony; he gave such sworn testimony in affidavit form to government investigators, and this material was read into the investigating committee's records as sworn testimony.

▮ The fact Benton was not subpoenaed to testify at the time he gave his first false testimony is not "vital" and not controlling. He intended to testify. Smith v. United States, 8 Cir. 1921, 274 F. 351, 353; Walker v. United States, 8 Cir. 1938, 93 F.2d 792, 795; United States v. Presser, 6 Cir. 1961, 292 F.2d 171, 174, affirmed by an equally divided court, 371 U.S. 71, 83 S.Ct. 178,

9 L.Ed.2d 163, rehearing den. 371 U.S. 960, 83 S.Ct. 498, 9 L.Ed.2d 508; Samples v. United States, 5 Cir. 1941, 121 F.2d 263, cert. den. 314 U.S. 662, 62 S.Ct. 129, 86 L.Ed. 530; Odom v. United States, 5 Cir. 1941, 116 F.2d 996, reversed [7] 313 U.S. 544, 61 S.Ct. 957, 85 L.Ed. 1511.

We distinguish Berra v. United States, supra, on the facts of the cases it cites and relies upon.

Appellant has raised questions on this appeal as to Counts I, II and III, but not with respect to IV—the income tax evasion. The conviction on that count involves no legal question, but purely the issue of whom the jury believed—as to whether the money represented by the checks was earned and should have been reported by Stein or Benton. The jury believed Benton, and not Stein. We are required to affirm.

The judgment is affirmed as to all counts.

---

7. We assume that the reversal was on grounds other than the point here cited. The United States Reports only state that the case was reversed on the ground that the Solicitor General confessed error. That error must have been on some point other than the point here cited, for the fifth circuit later in that year said the same thing in the Samples case, supra, in which case a writ of certiorari was denied.