**UNITED STATES of America, Plaintiff–Appellee,**

v.

**John Val BROWNING, Defendant–Appellant.**

No. 79–1893.

United States Court of Appeals, Tenth Circuit.

Argued and Submitted Oct. 15, 1980.

Decided Nov. 14, 1980.

David M. Rosen, Sp. Asst. U. S. Atty., St. Louis, Mo. (Ronald L. Rencher, U. S. Atty., Salt Lake City, Utah, and Frederick R. Buckles, Sp. Asst. U. S. Atty., St. Louis, Mo., with him on the brief), for plaintiff–appellee.

Elkan Abramowitz, New York City (Adam E. Ritholz and Obermaier, Morvillo, Abramowitz & Fitzpatrick, New York City, and Herschel J. Saperstein and Michael F. Heyrend of Watkis & Campbell, Salt Lake City, Utah, with him on the brief), for defendant–appellant.

Before McWILLIAMS, BREITENSTEIN and DOYLE, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

The defendant above named, who was formerly President of Browning Arms Company, here appeals a conviction on an indictment which charged that Browning, with knowledge of an ongoing investigation which was being conducted by the United States Customs Service, endeavored to obstruct the due and proper administration of the Customs duties laws as to material matters by advising and suggesting that an exporter of the Browning rifles give incomplete and misleading answers to questions which had been propounded by the Customs Service, contrary to 18 U.S.C. § 1505.[1]

This prosecution grows out of the importation by Browning Arms Company of great numbers of .22 caliber semi–automatic rifles from a Parisian firearms concern named Fabrique Nationale d'Arms de Guerre, which company will be referred to as FN. FN manufactured these rifles in accordance with specifications and designs provided by Browning Arms Company. The problem arose because of the fact that during the latter half of the 1960's, the Browning .22 caliber rifle could not be competitive with domestically manufactured .22 caliber rifles if they were priced in excess

---

1. Whoever corruptly, or by threats or force, or by any threatening letter or communication influences, obstructs, or impedes or endeavors to influence, obstruct, or impede the due and proper administration of the law under which such proceeding is being had before such department or agency of the United States.

of $25.00, because of the fact that the duty increases on imports that are valued between $25.00 and $50.00. Accordingly, FN and Browning agreed to maintain the price of the .22 semi–automatic rifles at $24.95. At the same time Browning Arms Company agreed to make additional payments to FN in excess of that stated in the invoice price. In the year 1965, the Customs Service changed its special Customs invoice Form No. 5515 so as to require disclosure of all assists which were not included in the invoice price. Notwithstanding the amendment to Form No. 5515, the Treasury Department, in April of 1965, published a Notice of Intention to Delay Requirements Revising Customs Form 5515, stating that the question on the form pertaining to assistance did not have to be answered. (Fed. Reg., April 19, 1965, at 5862). That question was not answered during the period 1965 through 1970, when there were nearly 200 invoices accompanying the shipment of .22 semi–automatic rifles from FN to Browning. Customs never requested that Browning answer the question.

It was not until 1970, when Browning Arms Company transferred production of these rifles from FN to Japan, that FN began to raise the invoice price of the rifles to reflect its true value. The invoice value is listed as $51.00 in the year 1971. Browning Arms instituted a new method of importing weapons in 1970, and the Customs Service sent investigators to see that Browning Arms was properly reporting under the new system. This investigation continued until 1975. Initially, the investigation was conducted by Trost and Regan. They discovered that various so–called "assists," the side payments paid to FN, amounted to as much as $18.40 for each weapon. The so–called assists were defined by Customs as payment by importer to exporter for tooling, design, development and other similar financial assistance. They did not include part of the cost or value of the weapon.

Early in the investigation, Mr. Regan requested that Browning answer the question on the invoice pertaining to assistance.

Browning responded that he was under the impression that the question did not have to be answered. But Regan wrote a letter to him saying that it was a part of the invoice.

After the transfer of production of the weapon to Japan and after FN raised the invoice price to a level of over $50.00, the investigators discovered that the company had not reported certain assists to the Customs Service from 1964 to 1970. Thereafter, the Customs Service, through Trost and Regan, conducted a full inquiry. They were unable to get sufficient information from the Browning companies, and another agent, one Duncan, was called into the case. Duncan concluded that it was necessary to investigate FN, and he communicated with one Rudman, a Customs Service representative, in Paris, France. Rudman met with FN officials several times and obtained answers needed by the investigators in St. Louis. He dealt with Heidebroek of FN. One of the questions asked of Heidebroek was why the price of the .22 caliber rifles had risen from $24.95 to over $50.00 in 1970. Heidebroek asked for time to research the answer. He then sent a letter to Mr. Browning, telling him of the visit by Mr. Rudman. This was March 25, 1974. Heidebroek explained that the United States Customs wished to know whether the invoice values contained the costs of tooling. He also attached 33 questions which had been asked by Rudman. One of the questions to FN sought to have FN supply the dollar amount of the costs not reflected on the invoice for the .22 rifles. Heidebroek sent this letter to the defendant, so that he could comment on the questions and supply information.

On June 4, 1974, Mr. Browning responded to the questions asked him by suggesting answers to the questions submitted in writing. One suggested answer said that, throughout the course of dealings with FN, Browning had stated the weapon had to cost below $25.00 or they could not place any orders, since the duty charged where the value was over $25.00 effectively killed sales of the rifles. The suggested answer

went on to say that some time after May of 1970 it was realized that it would not long be possible to maintain the price at $25.00 by absorption in general overhead. "We, therefore, had to bring the price over the $25.00 level, even though we might lose this job entirely." The answer concluded that the price was accordingly allowed to increase, first to $34.50, then to $42.00, and finally, to $51.40.

As a result of the increase, the manufacture of this rifle was transferred to Japan. The defendant answered question 20 by telling FN to tell Customs that no documents existed. The answer suggested by Browning was for FN to tell Customs that one reason the price rose to $51.40 was because the side price was phased out in 1970. Also, defendant requested that FN tell Customs that the price had been maintained at $24.95 by absorbing the loss on this rifle under the general overhead of FN. The truth was that there was a side price which was paying the so-called loss, rather than the loss being absorbed in general overhead. Thus, the defendant's answer sought to conceal from Customs the existence of the side price, and to have Customs believe instead that any costs to FN above $24.95 were being absorbed in overhead. In his communications to Heidebroek, the defendant acknowledged that even though the goal was to avoid side payments, that this should not be admitted because side payments would amount to fraud.

The charge is predicated on an attempted corrupt obstructing or impeding of due and proper administration of the law, and the charge itself was tied to the giving of incomplete and misleading answers to questions which had been asked by the Customs Service. Browning's appeal is based upon the following contentions:

A. That there was insufficient evidence to sustain a conviction.

B. That the Customs investigation could not be regarded as "due and proper administration of the law within the meaning of § 1505," supra.

C. That the trial court erred in failing to instruct the jury that counseling literal and responsive answers to the questions presented constituted a defense of the charge, and,

D. That the government should be estopped from criminally prosecuting Browning.

A–1. *Was the Evidence Sufficient to Sustain Appellant's Conviction for Obstructing Justice?*

Was Appellant's Conduct Unrelated to a Material Issue in the Administrative Proceeding?

Appellant argues that the advice he gave to FN was not material to the Customs search. Appellant claims that in order to be convicted for obstruction of justice, the conduct constituting the alleged offense must have been material to the investigation. *United States v. Ryan*, 455 F.2d 728 (9th Cir. 1972).

■ Unquestionably, the conduct of the accused must have been material to the investigation, but we conclude that the conduct of Browning was materially related to the investigation.

Browning argues that Customs was interested in discovering the costs of the rifles and not the price; that the supplemental payments were material to the price only, and not the cost. The cost to manufacture these rifles remained stable regardless of the price the company paid for the rifles. Therefore, Browning further argues, any advice he gave pertaining to supplemental payments was only relevant to a non-material issue of the investigation.

The object of the Customs investigation was to learn the *value* of the rifles imported by Browning, whereby the duty could be assessed. Mr. Hintz, Director of Classification and Value Division for the St. Louis Customs District, stated that in assessing the duty due on an imported item the Customs Service determines the value and classification of the item. Mr. Trost, the import specialist from Customs, testified that

value was the important element in determining the duty owed on imports. So also did Mr. William Rudman, Special Agent of the United States Customs Service, testify to that effect. The correspondence between Browning and FN personnel showed that the Browning and FN people were aware Customs was seeking to discover the value of the rifles, and that value had to do with price, as well as cost. 19 U.S.C. § 1401a defines the term "value" as it pertains to imported merchandise and that section does not consider costs alone, but also considers price.

We must, therefore, hold that both cost and profit were and are material to the Customs investigation. Accordingly the information pertaining to the supplemental payments from Browning to FN become very material in determining the genuine value of the rifles for Customs purposes.

Browning maintains that inasmuch as FN had furnished the actual cost of the rifles to Customs that Customs knew the differential that existed between the invoice price and the actual cost, and that it was not necessary that customs know the manner of compensating for the differential. Browning, however, is now talking about a document in which FN furnished the actual cost to Customs, which is dated July 22, 1974, long after the relevant period of the Customs inquiry. This document was furnished to Customs after the dates when Browning was attempting to encourage FN to give misleading answers to the questions submitted by Customs. Browning's telex to FN suggesting answers to the questions asked by Customs was sent June 4, 1974, and the relevant telephone call from Browning which made other suggestions as to answers to give to Customs was on June 5, 1974. So, at the time of Browning's alleged effort to persuade FN to give false answers the Customs officials had not learned about the actual cost, profits or price of the rifles.

Unquestionably the Customs had a legitimate interest in ascertaining the value of the rifles in order to determine how much tax was due on them. The value includes not only the cost of production of the rifles, it includes as well all relevant factors making up the price. So, when there were communications having to do with value, these were material to the investigation. It cannot be said, therefore, that the applicant's conduct was unrelated to a material issue in the administrative proceeding and it cannot be said that his contention that the evidence was insufficient to establish obstruction of justice was valid.

A–2. *Is the Evidence Insufficient to Sustain a Conviction Since Appellant Contends That he Merely Counseled the Omission of Unrequested Information which Did Not Result in a False Statement and Did Not Hinder the Proceeding?*

Browning relies on the Supreme Court's decision in *Bronston v. United States*, 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973) to support and illustrate his contention that he is not to be prosecuted for advising FN to give a literally true answer to the questions asked by Customs. But Bronston differs from the case that we now consider. Bronston involved a perjury prosecution in which the question was whether the defendant had told the truth. The ultimate question in the case at bar is not whether the defendant told the truth but whether the defendant obstructed or interfered with the process of truthfinding in an investigation in the process of enforcing the law. In other words, was the defendant, Mr. Browning, seeking to counsel FN to answer the questions in a manner which would interfere with the process of truthfinding? Literal truth is not the test here, and, in any event, Browning did not counsel FN to tell the literal truth.

In the telex communicated by Browning to FN June 4, 1974, FN was advised to say in answering question 9 to the Customs officials that the reason that the price increased from 1970 to 1971 over $25.00 a unit was because:

* * * * "about May 1970 we realized that it would no longer be possible to maintain the price of 25 dlrs by absorption in general overhead. We therefore, had to bring the price over the 25 dlr level even though we might lose this business entirely. The price was accordingly allowed to increase, first to 34.50 dlrs, then to 42.00 dlrs, and it finally became 51.40 dlrs * * * *."

The misstatement was the recitation within the quoted material that the price had long been maintained at $25.00 by absorption in general overhead. This was plainly false. Browning had paid the cost, including the $25.00 invoice price, by giving supplemental payments to FN under the guise of reimbursement of development expenses. It is obvious, therefore, that Browning counseled FN to misstate the facts, to give an incorrect answer to a specific question propounded by Customs.

The foregoing is supported by the phone call that Browning made to Mr. van der Rest of FN which took place June 5, 1974 in which Browning told van der Rest that:

"what is overall to be avoided is that they [Customs] would be given the information that, with the .22 rifles side payments have been done. The Customs will very well know the goal of what we have done but to say squarely that side payments have been done is a matter of fraud."

So again Browning did not advise FN to tell the literal truth about the side payments. Browning counseled FN not to reveal the facts about the side payments.

■ In view of the fact that Customs was not told the literal truth, and that FN was counseled by Browning as to how to avoid telling the truth, Browning is in a poor way to maintain that he did not contribute to the obstruction of the enforcement of the laws.

A–3. *Did the Conduct of the Defendant Considered as a Whole Constitute a Finding That the Defendant Acted Corruptly as Required by the Statute?*

The essence of the argument on Browning's behalf is that an additional element enters into a determination of whether his conduct was corrupt. Counsel states that there is no proof of sinister behavior and hence the evidence fails to establish this essential requirement. We disagree.

It is said that the defendant in his conversations with FN was not seeking profit for himself; that he was acting on behalf of his company; that the payments were by check from one corporation to another; that the defendant was under no mandate from Customs not to talk to FN and that as a result defendant did not act corruptly. The argument becomes less valid when counsel states that Browning "neither lied nor counseled a lie." But Browning did counsel the FN officer to answer the questions submitted in a manner which would mislead the government in its quest for information with which to determine the value of the imported rifles. The government's case is based on all of the basic facts and the reasonable inferences which flow from those facts and these speak loudly to the proposition that the attempt was made to misrepresent the value of these rifles and thereby pay a greatly reduced custom duty.

■ Counsel next pleads that he was never warned that this conduct was in violation of law. Any reasonable man would realize that conduct which sought to mislead and did mislead the government as to the amount to be paid for import duty was unlawful, and, therefore, it was not necessary for Browning to be aware of the exact details of the statute.

Finally we are told by counsel that there was nothing evil or sinful in Browning's conduct, that the only evil existed, perhaps, in Browning's thoughts. Wrong. The fact that Browning did not tell the FN listener that he wanted him to defraud the government is immaterial. The sum total of the background and the advice is sufficient to show that such was Browning's intent.

In recent months we have considered this issue. The case was *United States v. Ogle*, 613 F.2d 233 (10th Cir. 1979). We there said that the term "corruptly" as used in obstruction of justice statutes "is directed to the effort to bring about a particular result such as affecting the verdict of a jury on the testimony of a witness.... This is *per se* obstruction of justice...." Id. at 239. We further said that if the jury in the subject case in which the defendant was seeking to influence the verdict of the jury believed that the defendant had done the acts complained of that this would be sufficient evidence to sustain the defendant's conviction. Although the efforts of Browning were somewhat more subtle than the acts of Ogle, there is no difference in terms of legal effect.

In *United States v. Browning*, 572 F.2d 720 (10th Cir. 1978), *cert. denied*, 434 U.S. 822, 99 S.Ct. 88, 58 L.Ed.2d 114, we were called upon to construe the statutes under which this indictment was reached, i. e., 18 U.S.C. § 1505. A motion to dismiss the indictment had been granted and it was contended that advising another to give false statements did not constitute a corrupt act. Because of this argument in support of a motion to dismiss and in the absence of evidence, we considered and discussed the meaning of corruption under the statute.

The district court had ruled in dismissing the indictment that only "evil means" such as coercion and intimidation of witnesses constitute a violation. We added:

"The authorities are to the contrary. They hold that advising or procuring false testimony or statements comes within the prohibition of the obstruction of justice statutes. See *United States v. Abrams*, 427 F.2d 86 (3d Cir.), *cert. denied*, 400 U.S. 832, 91 S.Ct. 64, 21 L.Ed.2d 63 (1970) (§ 1505); *Cole v. United States*, 329 F.2d 437 (9th Cir. 1964), *cert. denied*, 377 U.S. 954, 84 S.Ct. 1630, 12 L.Ed.2d 497 (1964) (§ 1503); *Stein v. United States*, 337 F.2d 14 (9th Cir. 1964). In *United*

*States v. Henderson*, 386 F.Supp. 1048 (S.D.N.Y.1974), the court said:

'Under sections 1503 and 1505 the word "corruptly" has been given a broad and all–inclusive meaning; both sections have been held to encompass obstruction in the absence of force or threats.... 386 F.Supp. at 1055.' "

572 F.2d at 724–725.

■ The jury would, of course, in order to find that Browning acted corruptly, have to find that under the evidence presented Browning advised FN to give false statements or acted in a manner to produce a result which would obstruct the investigation. Such a finding by the jury would fulfill the requirement that Browning's conduct was corrupt. In effect the jury did so find and the evidence was sufficient to allow it to so find. Therefore, counsel's argument, although ingenious, is insufficient.

B. *Did the Inquiry by Customs Constitute "Due and Proper Administration of the Law" Within the Meaning of the Statute?*

■ Counsel for Browning here argues that William Rudman, the Customs official assigned to question FN, was without official authority to conduct an investigation of a foreign company, and thus, since there was no authority for Rudman to conduct an investigation of FN and since, therefore, Rudman's efforts did not constitute an "official inquiry", Browning's endeavor to influence the results of the questions could not constitute an attempt to obstruct "the due and proper administration of the laws." The contention is based on a faulty premise, namely that the investigation was of FN. The United States Customs was engaged in an investigation of Browning Arms Co., a United States concern; FN was not the culprit. Rudman was asked to talk to the officials of FN regarding the ongoing investigation of Browning Arms Co.

Viewed in this light the questioning of FN in furtherance of the Browning investi-

gation constituted the due and proper administration of the laws regulating Customs investigations of United States companies. Rudman was performing duties required of him as an investigator for the United States Customs Service. The questioning of the FN officials was a valid part of the administrative investigation and it follows that the claim must be denied.

C. *Did the Evidence Justify the Submission of an Instruction to the Jury That the Counseling of Literally True and Responsive Answers to the Questions Presented was a Defense to Count I of the Indictment Against Browning?*

■ The requested instruction would be justified only if there existed at least a fighting question as to whether Browning had instructed literally true and responsive answers. Or, stated differently, did Browning merely select a different way of answering the question and did this alternative answer constitute a true response? Under the circumstances presented this instruction would be misleading and confusing. We must hold that the action of the trial court in refusing the proposed instruction was correct.

D. *Should the Government be Estopped from Criminally Prosecuting the Appellant as a Result of Their Having Allegedly Misled Him?*

The general thrust of Browning's argument here is that he was misled by investigator Regan to believe that he had acted illegally over the years in not answering the question regarding assists on the Customs invoices, and that the alleged obstruction of justice occurred because of that misinformation, since Browning argues that if Regan were correct and Browning should have been disclosing the assists, Browning Arms would have faced financial ruin. As a consequence Browning decided to not divulge the information regarding supplementary payments to FN.

■ Quite apart from the proposition that Browning was not shown to have been misled or to have acted on the basis of having been misled, (Browning acted out of expediency; he sought to avoid high import duties by misrepresenting the value) the law of estoppel in relationship to the government is not available to Browning. The courts invoke the doctrine of estoppel against the government with great reluctance. The only circumstances justifying use of the doctrine are those which add up to the conclusion that it does not interfere with underlying government policies or unduly undermine the correct enforcement of a particular law or regulation. See generally Annot., 27 ALR Fed. 702 (1976).

■ It is fundamental that the United States is not estopped by representations made by an agent without authority to bind the government in a transaction. *Jackson v. United States*, 573 F.2d 1189 (Ct.Cl.1978); *Albrechsten v. Andrus*, 570 F.2d 906 (10th Cir.), *cert. denied*, 439 U.S. 818, 99 S.Ct. 79, 58 L.Ed.2d 109 (1978); *Enfield v. Kleppe*, 566 F.2d 1139 (10th Cir. 1977); *Atlantic Richfield Co. v. Hickel*, 432 F.2d 587, 591–592 (10th Cir. 1970); *Massaglia v. Commissioner of Internal Revenue*, 286 F.2d 258, 262 (10th Cir. 1961).

It has been held that one who relies on a legal interpretation by a governmental official assumes the risk that it is in error. *Airmotive Engineering Corp. v. United States*, 535 F.2d 8, 11 n.3, 210 Ct.Cl. 7 (1976). It has also been held or said that "the government could scarcely function if it were bound by its employees' unauthorized representations." *Goldberg v. Weinberger*, 546 F.2d 477, 480 (2nd Cir. 1976), *cert. denied*, 431 U.S. 937, 97 S.Ct. 2648, 53 L.Ed.2d 255 (1977).

We regard this entire effort as an expedient position which was not the real cause of his activity. The real cause of keeping the supplemental payments secret was the need to keep the price of the rifles down and therefore, the need to reduce the amount of duty. *United States v. Pennsylvania Industrial Chemical Corporation*, 411 U.S. 655, 93 S.Ct. 1804, 36 L.Ed.2d 567 (1973) is not

germane. That case stands for the proposition that if a defendant relies in good faith on a government regulation the government may be prevented from criminally prosecuting that defendant for acting pursuant to it. In *Pennsylvania* the defendant had been charged with violating a statute and the defendant maintained that a government regulation permitted him to do what he had done. The court, however, held that the defense should be allowed to show that he relied in good faith on a government regulation. If the defendant were able to establish good faith reliance the court said that the government should then be prevented from prosecuting him.

The government's position is that the *Pennsylvania* decision is wholly different on its facts from the case at bar. In the case presented the defendant did not make a false statement upon an invoice or entry, and thereby violate a statute which a regulation was in conflict with. In *Pennsylvania*, the defendant claimed that he acted as a result of confusion as to whether he had in law violated a statute which a regulation seemed to be in conflict with, and which regulation allowed him to follow the course which he took. In the case at bar, the government points out that there is no governmentally caused confusion. The defendant is unable to establish that he had a good faith belief which allowed him to misstate and attempt to persuade FN to misstate the value of the imported rifles. The effect, therefore, of the government's argument is that any confusion that Browning may have had did not and could not have served to justify continuing the deceitful practices in question since the conduct of Browning was foreign to any misconception which he contends existed.

Browning admitted that his sole purpose in making the supplemental payments to FN was so as to keep the price of the .22 semi–automatic rifle imported from Belgium competitive with the price of similar rifles manufactured in this country. Had he disclosed the fact of the supplemental payments to Customs the duty on the .22s would have risen substantially, and it would not have been possible for Browning to sell the .22s in a competitive market. These uncontested facts lead to the conclusion that the reason Browning paid the amount of the price above $24.95 as supplemental payments to FN rather than disclosing that amount as part of the invoice price was that Browning had not intended to tell Customs of that additional figure.

The United States Supreme Court has spoken on this. It stated in *Federal Crop Insurance Corporation v. Merrill*, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947), that, as a general rule, the government would not be bound by the incorrect and misleading statements of its agents. It refused to apply the private law principles of estoppel against the government because it obviously considered that the government's policies, which have general social significance, should not be at the mercy of an errant government official. In *Merrill*, as in the instant case, a government official had given the plaintiff information which was in contradiction to the applicable government regulation. The court refused to hold the government bound (or estopped) by the erroneous information given by the government's representative.

■ In the case at bar, at least one government agent, Regan, did misinform Browning regarding the requirements to be complied with when filling out the Customs forms. The statements made by Regan were incorrect. Under the settled law, however, incorrect statements made by a government official may not serve as a basis for holding the government estopped *from enforcing its regulations even if the misinformation had led to Browning's subsequent conduct.*

Even if this were not the law, it was not shown that Browning relied on Regan's statements. Additionally even if Regan's statements *could* be used as a basis for holding the government estopped, and even

if Browning *had* relied on Regan's statements, Browning is in a poor position to use the doctrine. Principles of estoppel may not be used to justify a person's deliberate violation of one statute in order to escape liability under another statute.

We conclude that the trial court did not err in either the particulars relied on or otherwise.

We affirm.