**ATLANTIC RICHFIELD COMPANY, Plaintiff-Appellant,**

v.

**Walter J. HICKEL, Secretary of the Interior, and C. J. Curtis, Regional Oil and Gas Supervisor, United States Geological Survey, Casper, Wyoming, Defendants-Appellees.**

No. 671–69.

United States Court of Appeals, Tenth Circuit.

Oct. 13, 1970.

Robert A. Dick, of Akolt, Shepherd, Dick & Rovira, Denver, Colo. (Stuart S. Gunckel, of Akolt, Shepherd, Dick & Rovira, Denver, Colo., A. G. McClintock, of McClintock, Mai & Urbigkit, Cheyenne, Wyo., Rex Short, Tulsa, Okl., and James Patrick Miller, Denver, Colo., on the brief) for appellant.

George R. Hyde, Atty., Dept. of Justice, Washington, D. C. (Shiro Kashiwa, Asst. Atty. Gen., Richard V. Thomas, U. S. Atty., Edmund B. Clark and Thomas L. McKevit, Attys., Dept. of Justice, on the brief) for appellees.

Before BREITENSTEIN, HILL and SETH, Circuit Judges.

HILL, Circuit Judge.

This case is on appeal from an order granting the Secretary's motion for summary judgment. That order sustained an earlier administrative determination by the Department of the Interior that Atlantic Richfield Company [1] was not entitled to the flat 12½ percent royalty rate granted by 30 U.S.C. § 226c. The judgment, by denying Atlantic the benefit of the section 226c reduced rate, required payment of $3,209,763.30 for underpaid royalties from 1948 until 1961.

The facts giving rise to the controversy are undisputed and appear as follows: The subject oil and gas leases, Cheyenne 029620(a) and Cheyenne 065546, were issued on a noncompetitive basis [2] to Atlantic by the United States on January 1, 1940. Each lease contained a step-scale royalty provision whereby the royalties due the lessor increased from 12½ percent to 32 percent, as production increased.

In December, 1942, the O'Mahoney Act, 56 Stat. 1080, was enacted to encourage discovery efforts on federal leases by granting reduced royalty rates to new discoveries of oil and gas. On August 8, 1946, major amendments to the Mineral Leasing Act of 1920 were enacted, including the provision here in controversy. The statute, 30 U.S.C. § 226c, reads as follows:

From and after August 8, 1946, the royalty obligation to the United States under all leases requiring payment of royalty in excess of 12½ per centum, except leases issued or to be issued upon competitive bidding, is reduced to 12½ per centum in amount or value of production removed or sold from said lease as to (1) such leases, or such part

---

1. Atlantic Richfield is the successor in interest to the interests of all prior parties owning the subject oil and gas leases when the controversy arose. The appellant will be referred to as Atlantic and will be denoted as the party in interest in all stages.

2. A competitive lease covers lands within the known geological structure of a producing oil or gas well. A noncompetitive lease is one on lands not believed to be within the known geologic structure of a producing oil or gas well.

of the lands subject thereto, and the deposits underlying the same, as are not believed to be within the productive limits of any oil or gas deposit, as such productive limits are found by the Secretary to exist on August 8, 1946, and (2) any production on a lease from an oil or gas deposit which was discovered after May 27, 1941, by a well or wells drilled within the boundaries of the lease, and which is determined by the Secretary to be a new deposit; and (3) any production on or allocated to a lease pursuant to an approved unit or cooperative agreement from an oil or gas deposit which was discovered after May 27, 1941, on land committed to such agreement, and which is determined by the Secretary to be a new deposit, where such lease was included in such agreement at the time of discovery, or was included in a duly executed and filed application for the approval of such agreement at the time of discovery.

Production was obtained from the Tensleep and shallower formations on both leases prior to August 8, 1946, and royalties have been paid according to the step-scale provision on that production. The Madison formation was discovered in January, 1948, and in June, 1948, the Cambrian formation was found. Both are beneath the Tensleep and were found by drilling on adjacent privately owned land.

As to the Madison formation, Atlantic requested on January 6, 1948, that the Director, Geological Survey, determine with respect to the two leases, that the land in those leases was "outside and not within the productive limits of any producing oil or gas deposit lying below the base of Tensleep formation, as such productive limits were known to exist on August 8, 1946, as authorized by Section 12 of the Act of Congress approved August 8, 1946." The Acting Director replied that the leased lands were not within the productive limits of any produc-

ing oil or gas deposit lying below the Tensleep as such productive limits were known to exist August 8, 1946.

Wells were completed to the Madison formation on both leases in March and August, 1948, and Atlantic transmitted division orders to the U. S. Geological Survey showing a 12½ percent royalty rate. The Supervisor, Geological Survey, approved the division orders with the caveat "nothing herein shall be construed as affecting any of the relations between the lessee and the Secretary of the Interior."

In September, 1949, and May, 1950, wells on both leases were completed to the deeper Cambrian formation. Similar correspondence was exchanged with the U.S. Geological Survey personnel, resulting in appellant paying the flat 12½ percent as granted by 30 U.S.C. § 226c.

On November 22, 1961, the Regional Oil and Gas Supervisor advised Atlantic that back royalties due according to the step-scale provision were being demanded from April 1, 1948, to September 30, 1961, as to production from the Madison and Cambrian formations. The demand was appealed to the Director, Geological Survey. The Acting Director sustained the Supervisor's demand and Atlantic appealed to the Secretary of the Interior. The Solicitor, acting for and in behalf of the Secretary, affirmed the Acting Director. This controversy now, for the first time, presents section 226c to the courts for judicial review.[3]

■ The Secretary and the district court concluded that where part of the *land* in an oil and gas lease lies within the *horizontal* limits of an oil or gas deposit, known to be productive on August 8, 1946, the lessee is not entitled under item (1) of 30 U.S.C. § 226c, to a flat 12½ percent royalty rate on production later obtained from deeper zones underlying the same horizontal limits, when such zones were discovered by drilling outside the lease boundaries after August 8, 1946. The initial question is

3. One similar case, Richfield Oil Corp., 62 I.D. 269 (1955) was decided within the Department of the Interior, but it never reached a judicial forum.

whether the statutory language supports that conclusion.

In substance, Atlantic argues that item (1) of the statute applies the 12½ percent rate to any well, except those on leases issued pursuant to competitive bidding, which produce from a *deposit* not known to exist on August 8, 1946. Thus, even though the land upon which a well is situated was within the known productive limits of some other deposit on that date, the flat 12½ percent rate should attach when a new deposit is discovered. The argument is supported to some extent by appellant's disjunctive interpretation of item (1). By their analysis, the 12½ percent rate extends: (1) where no part of the lease is within the productive limits of an oil or gas deposit on August 8, 1946; (2) to such part of the lands subject to such leases (part of the leased lands being within the productive limits of another deposit on the Act's effective date) as was not within the productive limits of a deposit on August 8, 1946; and (3) to such deposits underlying such leases as are not believed to be within the productive limits of other oil or gas deposits believed to exist on the effective date, but which underlie lands within the productive limits of a deposit believed to exist on August 8, 1946. If Atlantic's contentions are correct, then "productive limits" must be given a three dimensional meaning.

We are first confronted with the proper weight to be accorded the Secretary's decision. "The construction put on a statute by the agency charged with administering it is entitled to deference by the courts, and ordinarily that construction will be affirmed if it has a 'reasonable basis in law.' [citing cases] But the courts are the final authorities on issues of statutory construction, * * * and 'are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute. * * *'" Volkswagenwerk Aktiengesellschaft v. FMC, 390 U.S. 261, 272, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090 (1968).

On its face, the portion of the statute here in question is not as plain and unambiguous as appellant urges; that is, it does not clearly say that noncompetitive lease royalty rates on all new deposits discovered after August 8, 1946, are reduced to a flat 12½ percent. After closely scrutinizing the language and giving the administrative decision the deference to which it is entitled, we cannot conclude that the Secretary's position does not have a "reasonable basis in law."

Neither party directly disputes that item (1) grants a rate preference to "such leases, or such part of the lands subject thereto" which are outside the productive limits of a deposit believed to exist on August 8, 1946. To attribute the same degree of independent significance to the phrase "deposits underlying the same" would effectively nullify the prior phrases which explicitly grant preferences. The effect would be to extend the flat rate (a) to production on such *leases* not within the productive limits of an oil or gas deposit as found to exist August 8, 1946; (b) to production on such part of the *land* subject to such leases as are not within the productive limits of an oil or gas deposit as found to exist August 8, 1946; and (c) to production from new *deposits*, irregardless of whether they are on leases or parts of lands subject to such leases, which were within the productive limits of known oil or gas deposits found to exist on or before August 8, 1946. The result would be to grant the flat rate without regard to a deposit's location—a direct contradiction of the first part of item (1), and wholly inconsistent with the entirety of the statute.

We think it reasonable to conclude that if Congress had intended item (1) to apply to new deposits, it would have used the language of (2) and (3). In both (2) and (3) the flat rate is granted to production from an oil or gas deposit "determined by the Secretary to be a new deposit." Under those subsections it is clear that in response to a rate deter-

mination request, the Secretary need only decide whether the production is from a new deposit. But the language of (1) is distinctively different. The flat rate is not extended to production from a new deposit, but to "such *leases,* or such part of the *lands* subject thereto, and the deposits underlying the same, as are not within the productive limits of any oil or gas deposit." [emphasis added]

Moreover, a syntactical analysis supports the Secretary. "Item (1) clearly applies only to 'such leases' (*i.e.,* leases providing for royalties in excess of 12½ percent) 'as' are outside the productive limits of a deposit as of August 8, 1946. Item (1) does not refer to 'such' deposits 'as' are outside the productive limits of a deposit as of August 8, 1946. It refers only to 'the' deposits underlying the 'same.' What is the 'same'? Obviously 'same' means 'such leases' or 'such part of the lands' in such leases 'as' lie outside the productive limits of the deposit. In other words, the only 'deposits' covered by item (1) are those deposits which underlie leases or parts of leased lands which lie outside the productive limits of an oil and gas deposit as of August 8, 1946. If the lease or part of the leased land lies within the productive limits of such a deposit, then the 12½ percent royalty rate does not apply to production from that lease or that land or, *a fortiori,* from any deposit underlying that lease or that land." [4]

Our inquiry is not concluded, for Atlantic alternatively contends that estoppel precludes the Government from collecting the additional royalties. In brief, appellant argues that representations were made to Atlantic by the Acting Director of the Geological Survey, and in reliance thereon Atlantic believed that the flat 12½ percent royalty rate applied to production on the subject leases from deposits located below the Tensleep. The claim of detriment is supported by the following allegations: (1) An additional 2 percent override totalling $284,109 was paid to royalty owners on Cheyenne 065546 which would not otherwise have been paid, and the recovery of which is highly improbable; (2) Atlantic purchased the net profits of another company in Cheyenne, 029630 (a) for $6,500,-000 when, without the flat rate, the purchase price would have been $450,000 less; and (3) an excess of $76,401 has been paid by Atlantic in state, county and school taxes because of the reduced royalty rate. Thus, according to appellant's calculations, they stand to lose $4,050,273.30.

As a predicate to appellant's success on this issue, they must initially establish (1) that the "determination letters" sent to the Geological Survey were in fact requests for a determination of the productive limits of the stated formations, as provided for by section 226c(1); (2) that the Department agents recognized—or should have recognized—them as such and acted on them pursuant to the purposes of the statute; and (3) that such action was within the scope of authority of the agents of the Department. Without *deciding* the merits of (1) and (2), but for the moment taking them as true, we are even then unable to sustain Atlantic's argument.

■ The premise of appellant's argument is built around the rule which states that the doctrine of equitable estoppel binds the Government for the conduct of its agents while they are acting within the scope of their employment.[5] But a corollary to that rule is the established principle that the United States may not be estopped from asserting a lawful claim by the erroneous or unauthorized actions or statements of its agents or employees, nor may the rights of the United States be waived by unauthorized

4. Sinclair Oil and Gas Co., 75 I.D. 155 (1968).

5. Interstate Fire Ins. Co. v. United States, 215 F.Supp. 586 (E.D.Tenn.1963); *aff'd* 339 F.2d 603 (6th Cir. 1964); United States v. Certain Parcels of Land, 131 F.Supp. 65 (S.D.Cal.1955); Smale & Robinson v. United States, 123 F.Supp. 457 (S.D.Cal.1954); Branch Banking & Trust Co. v. United States, 98 F.Supp. 757, 120 Ct.Cl. 72 (1951).

agents' acts.[6]  As harsh as the tenet is under practical application, an administrative determination running contrary to law will not constitute an estoppel against the federal government.

■ Application of these settled rules of law, in our opinion, defeats Atlantic on all fronts.  We earlier concluded that the statute did not extend the reduced royalty rate to the subject leases.  Thus, we are only able to conclude that if the agents in the Department of the Interior intended in 1948, or in subsequent years, to find that appellant was entitled to the flat 12½ percent royalty rate for production from deposits beneath the Tensleep formation, that determination was contrary to the Congressional intent of section 226c(1), and thereby outside the scope of the agents' authority.  "Anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority."  Federal Crop Insurance Corp. v. Merrill, 332 U.S. 380, 384, 68 S.Ct. 1, 3 (1947).

It is too evident to require lengthy discussion, that whatever the reason for the error in this case, the result was contrary to the mandate of section 226c(1).  Suffice it to say that the Secretary is and was without authority to accept less than that provided for in the step-scale provision of the lease, unless section 226c granted a lesser royalty rate.  No justification existed here for a lesser royalty rate, and the acquiescence by the Government's agents and acceptance of a lesser royalty for thirteen years, does not alter the obligation of the Secretary, nor do those circumstances estop the Government.

The hard but simple truism that all who transact with the Government must face, is that "men must turn square corners when they deal with the Government."  Rock Island, A. & L. Railroad Company v. United States, 254 U.S. 141, 143, 41 S.Ct. 55, 56, 65 L.Ed. 188 (1920).  Although the outcome often causes hardship, it is not a callous doctrine we uphold.  "It merely expresses the duty of all courts to observe the conditions defined by Congress for charging the public treasury."  Federal Crop Insurance Corporation v. Merrill, 332 U.S. at 385, 68 S.Ct. at 3.

Affirmed.

6.  Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947); United States v. California, 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889 (1947); Utah v. United States, 284 U.S. 534, 52 S.Ct. 232, 76 L.Ed. 469 (1932); Utah Power & Light Co. v. United States, 243 U.S. 389, 37 S.Ct. 387, 61 L.Ed. 791 (1917); Pine River Logging & Improvement Co. v. United States, 186 U.S. 279, 22 S.Ct. 920, 46 L.Ed. 1164 (1902); Massaglia v. C. I. R., 286 F.2d 258 (10th Cir. 1961); City and County of San Francisco v. United States, 223 F.2d 737 (9th Cir. 1955); United States v. Carter, 197 F.2d 903 (10th Cir. 1952); United States v. Fitch, 185 F.2d 471 (10th Cir. 1950).