**HOME SAVINGS AND LOAN ASSOCIA-
TION OF LAWTON, OKLAHOMA,
Plaintiff-Appellee,**

**v.**

**Robert P. NIMMO, Administrator of the
Veterans Administration,
Defendant-Appellant.**

**No. 80–1987.**

United States Court of Appeals,
Tenth Circuit.

Dec. 21, 1982.

Rehearing Denied April 21, 1983.

Edward W. Dzialo, Jr., Lawton, Okl. (Godlove, Joyner, Meyers & Mayhall, Inc., Lawton, Okl., with him on briefs) for plaintiff-appellee.

John C. Hoyle, Washington, D.C. (Stuart E. Schiffer, Acting Asst. Atty. Gen., Washington, D.C., Larry D. Patton, U.S. Atty., Oklahoma City, Okl., John E. Green, First Asst. U.S. Atty., Oklahoma City, Okl., and William Kanter, Atty., U.S. Dept. of Justice, Washington, D.C., with him on briefs) for defendant-appellant.

Before SETH, McKAY and BREITENSTEIN, Circuit Judges.

BREITENSTEIN, Circuit Judge.

This action was brought in state court against an official of the Veterans Administration, a federal agency, to recover on a loan guaranty certificate. The case was properly removed to federal court. 28 U.S.C. §§ 1346(a)(2) and 1361. After a non-jury trial the district court rejected the government defense of forgery and gave judgment for the plaintiff. We affirm.

In April, 1971, Oklahoma Mortgage Company loaned Percy and Zelma Durham $34,000 on a residential property with the security of a note and mortgage. The loan was guaranteed by the Veterans Administration, VA, pursuant to 38 U.S.C. Chapter 37. The note, mortgage and guaranty were subsequently assigned to plaintiff-appellee, Home Savings and Loan Association. Because of defaults in payments, Home Savings, the assignee, brought foreclosure proceedings on July 12, 1974. Zelma Durham was personally served with process and made no claim that her signatures on the note and mortgage were forged. At the January 28, 1975, foreclosure sale, Home Savings bid in the property for $30,000, the amount VA had authorized it to bid. Pursuant to 38 C.F.R. § 36.4320(a)(1), Home Savings exercised its option to convey the property to VA which received a sheriff's deed on February 24, 1975. On approximately the same date, Oklahoma Mortgage, the original lender, informed VA that Zelma's signatures on the note and mortgage might be forgeries. VA began an investigation but did not inform Home Savings, the assignee, of the forgery possibility or of the investigation. Home Savings submitted to VA a claim for $6,739.68 under the loan guaranty certificate. On April 4, 1975, VA paid Home Savings $30,000, the purchase price of the property at the foreclosure sale. On April 16, VA sold the property for $31,000. On October 16, VA paid Home Savings $6,733.19 under the guaranty. Twelve days later, VA demanded that Home Savings return the payment because the VA investigation had established that Zelma's signatures were forged. VA also demanded that Home Savings pay it $1,055.44, as its loss because of expenses on the sale of the property. Home Savings paid VA the $6,733.19 which it had received under the loan guaranty but refused to pay the $1,055.44 claimed as a sale loss. VA then offset the latter amount against other amounts due Home Savings.

Home Savings brought this suit to recover both the $6,733.19 and $1,055.44 amounts. The trial court held that VA was estopped from asserting the defense of forgery because it had knowledge of the forgery when it accepted the sheriff's deed.

On this appeal VA contends that the district court improperly applied estoppel against the government. The VA guaranty is incontestable but the Administrator may assert defenses based on fraud, 38 U.S.C. § 1821, or forgery, 38 C.F.R. § 36.4325(a). The forgeries of Zelma's signatures were established at the trial and are not contested by Home Savings. VA learned of the possibility of forgeries from Oklahoma Mortgage Co., the original lender. No claim is made that Home Savings had any knowledge of the forgeries until advised by VA in October, 1975, long after the foreclosure sale, the VA reimbursement of Home Savings of the $30,000 paid at the sale, and the VA sale of the property for $31,000.

None of the Supreme Court decisions on estoppel against the government present facts having any similarity to those here. The most recent decision is *Schweiker v. Hansen,* 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685. The Court rejected the estoppel claim of an applicant for social security benefits. The Court held that an agency's field representative's erroneous statement and noncompliance with the agency's Field Manual did not estop the Secretary's denial of the claimed retroactive benefits. In so doing the Court said, Id. at 788, 101 S.Ct. at 1470–1471: "This Court has never decided what type of conduct by a Government employee will estop the Government from insisting upon compliance with valid regulations governing the distribution of welfare benefits."

In *Federal Crop Insurance Corp. v. Merrill,* 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10, the Court rejected an estoppel claim arising out of the acceptance by the corporation's agent of a crop insurance application which did not comply with an applicable regulation. The Court said hardship from innocent ignorance does not justify an estoppel claim and that the government's freedom from estoppel "merely expresses the duty of the courts to observe the conditions defined by Congress for charging the public treasury." Id. at 385, 68 S.Ct. at 3.

*INS v. Hibi,* 414 U.S. 5, 94 S.Ct. 19, 38 L.Ed.2d 7, a naturalization case, denied an estoppel claim based on administrative failures of a federal agency. In so doing it quoted, Id. at 8, 94 S.Ct. at 21, the statement in *Utah Power & Light Co. v. United States,* 243 U.S. 389, 409, 37 S.Ct. 387, 391, 61 L.Ed. 791, that: "As a general rule laches or neglect of duty on the part of officers of the Government is no defense to a suit by it to enforce a public right or protect a public interest ...." The qualifying phrase "general rule" would seem to leave the door slightly ajar.

*Montana v. Kennedy,* 366 U.S. 308, 81 S.Ct. 1336, 6 L.Ed.2d 313, was a naturalization case where estoppel was based on the erroneous advice given by a consular officer. The Court held that the misconduct fell far short of that needed to estop the government. The Court recognized that "there may be circumstances in which the United States is estopped to deny citizenship because of the conduct of its officials." Id. at 315, 81 S.Ct. at 1341.

Several Tenth Circuit decisions discuss estoppel against the government. *Atlantic Richfield Company v. Hickel,* 10 Cir., 432 F.2d 587, 591–592, involved royalties payable to the government under a federal oil and gas lease. Atlantic Richfield claimed estoppel on the basis of representations made by the Acting Director of the Geological Survey and acted on by it as lessee. The court held that the United States is not "estopped from asserting a lawful claim by the erroneous or unauthorized actions or statements of its agents or employees."

*Albrechtsen v. Andrus,* 10 Cir., 570 F.2d 906, 909–910, rejected a claim of estoppel based on laches and neglect of duty by officials in connection with a coal prospecting permit. *United States v. Browning,* 10 Cir., 630 F.2d 694, 702, says it is fundamental that the United States is not estopped by representations made without authority by a federal agent.

*Sweeten v. United States Department of Agriculture Forest Service,* 10 Cir., 684 F.2d 679, says that in a dispute over land boundaries, a private owner must show "affirmative misconduct by the government or its agents to establish estoppel." Id. at 682. In so holding the court relied on *United States v. Ruby Co.,* 9 Cir., 588 F.2d 697, 703–704, cert. denied, 442 U.S. 917, 99 S.Ct. 2838, 61 L.Ed.2d 284. *Ruby* relied on *Santiago v. Immigration and Naturalization Service,* 9 Cir., 526 F.2d 488, 491–493, which in turn relied on *INS v. Hibi,* supra, 414 U.S. 5, 8, 94 S.Ct. 19, 21, 38 L.Ed.2d 7.

In *Schweiker v. Hansen,* supra, 450 U.S. at 788–789, n. 4, 101 S.Ct. at 1471 n. 4, the Court referred to cases in which federal courts have applied estoppel against the government and distinguished them on the facts. None of the above mentioned cases rejecting estoppel against the government relate to facts comparable to those presented in the instant case.

In the situation before us, the government, through VA, engaged in a commercial transaction pursuant to 38 U.S.C. § 1810, authorizing guaranty of loans to veterans for the purchase of homes. Oklahoma Mortgage made the loan and received the VA guaranty. It then assigned the loan and the VA guaranty to Home Savings. After default, Home Savings admittedly complied with VA procedures for foreclosure. VA knew of the suspected forgery when it accepted the sheriff's deed and paid Home Savings $30,000.

The parties agree that the district court correctly stated the tests for estoppel. They are:

(1)—The party to be estopped must know the facts.

(2)—He must intend that his conduct will be acted on or must so act that the party asserting the estoppel has the right to believe that it was so intended.

(3)—The latter must be ignorant of the true facts.

(4)—He must rely on the former's conduct to his injury.

Before discussing these elements we note that 38 C.F.R. § 36.4325(a), says that there is no liability on a loan guaranty when the loan papers are forged but its subsection (1) excepts a holder in due course without knowledge. Two decisions have held that forgery is a defense against a holder "even though that person is innocent of any wrong doing." *Century Federal Savings and Loan Association v. Roudebush,* 2 Cir., 618 F.2d 969, 972, and *Mt. Vernon Cooperative Bank v. Gleason,* 1 Cir., 367 F.2d 289, 292. Neither of those cases involved estoppel.

At the time of the foreclosure proceedings, the acquisition of the property by VA, and the payment by VA to Home Savings of $30,000 for the property, VA knew, but did not disclose to Home Savings, the possibility of forgery. Failure to disclose is inaction. The VA acceptance of the sheriff's deed and its payment of $30,000 to Home Savings are affirmative actions. Home Savings was entitled to rely on and to treat the transaction as an accomplished fact. VA now seeks to take advantage of its discovery, many months later, that Zelma's signatures were forged. Then, it was too late to unravel the yarn. VA had both acquired and sold the property.

No harm has occurred to the fiscal policies of the United States. The VA has recourse against the borrowing veteran. See *United States v. Shimer,* 367 U.S. 374, 386, 81 S.Ct. 1554, 1562, 6 L.Ed.2d 908. The VA had authority to do what it did and did not deprive the public of any statutory protection. See *Semaan v. Mumford,* D.C.Cir., 335 F.2d 704, 706, n. 6; *Smale & Robinson, Inc. v. United States,* S.D.Cal., 123 F.Supp. 457, 464–466.

By its affirmative acts, VA acquired and sold the property without disclosure to Home Savings of the forgery possibility. Home Savings complied with the VA regulations and relied on its acts. We are convinced that the first three estoppel tests are satisfied. The question of injury remains for discussion.

Home Savings argues that, if it had known of the forgery possibility and the

complications incident thereto, it could have retained the property and sold it at a profit. The only mention of value in the record is the VA appraisal of $32,000. Home Savings presented no evidence of market value. The lost profit claim is speculative. Speculation does not suffice to prove injury.

■ The exact date of VA's knowledge of the forgery of Zelma's signatures does not appear in the record. On March 28, 1975, before the sale of the property by VA, Home Savings submitted its claim for reimbursement under the VA loan guaranty in the amount of $6,739.68, later reduced to $6,733.19. On October 16, 1975, VA issued a treasury check to Home Savings for that amount. The government brief says, p. 3: "Shortly before the Guaranty Claim was paid, the Veterans Administration determined that Mrs. Durham's signature was in fact a forgery." On October 28, VA demanded that Home Savings return the guaranty payment and it did so. The question then is whether the loss of the loan guaranty is an injury. By its affirmative acts from the inception of the foreclosure suit and until after the guaranty payment, VA led Home Savings to rely on its compliance with VA regulations. VA does not claim that Home Savings failed to comply with any applicable regulation. The acts of VA were inconsistent with denial of the validity of the original loan transaction. VA is estopped from denying that validity. Home Savings is entitled to payment of the loan guaranty.

■ The situation with regard to the $1,055 sale expense presents another problem. VA acted in violation of its own regulations in assessing the sale costs against Home Savings. With narrow exceptions, not here applicable, the responsibilities of Home Savings ceased upon acceptance of the property by VA. See 38 C.F.R. § 36.-4320(h)(6), (7), (8), (9), and (10). The collection of the $1,055 from Home Savings by exercise of a set off is a compensable injury. VA is estopped from asserting otherwise.

The trial court awarded pre-judgment interest to Home Savings. VA's opening brief attacks that award. Its reply brief withdraws that attack.

Affirmed.

McKAY, Circuit Judge, dissenting:

In a dispute over the payment of a home loan subsidy, the majority invokes equitable principles to estop the Veterans Administration from asserting a congressionally authorized forgery defense. Relying on factual dissimilarities, the majority attempts to distinguish past Supreme Court decisions that have consistently sheltered the government from equitable estoppel.[1] I believe that the majority's distinctions will prove to be chimerical rather than precedential and will introduce new contradictions into an already confused area of law.[2] Moreover, I believe that the majority's approach diverts attention from the fundamental principles that underlie doctrines of equity. Only through an inquiry into the relationship between the government and private entities, and an analysis of the proper exercise of judicial power, will a coherent theory of equitable estoppel of the government emerge. For these reasons, I respectfully dissent.

I.

The district court's findings of fact are, in essence, as follows: In April 1971, the Vet-

---

1. See *Schweiker v. Hansen,* 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981) (per curiam); *INS v. Hibi,* 414 U.S. 5, 94 S.Ct. 19, 38 L.Ed.2d 7 (1973) (per curiam); *Montana v. Kennedy,* 366 U.S. 308, 81 S.Ct. 1336, 6 L.Ed.2d 313 (1961); *Federal Crop Insurance Corp. v. Merrill,* 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947); *Utah Power & Light Co. v. United States,* 243 U.S. 389, 37 S.Ct. 387, 61 L.Ed. 791 (1917).

2. As Justice Marshall recently noted, the question of when the government may be equitably estopped has been the subject of "considerable ferment," dividing panels and generating inconsistencies throughout the courts of appeals. *Schweiker v. Hansen,* 450 U.S. 785, 791, 101 S.Ct. 1468, 1472, 67 L.Ed.2d 685 (1981) (Marshall, J., dissenting). *See generally* Note, *Equitable Estoppel of the Government,* 79 Colum.L. Rev. 551 (1979).

erans Administration (VA) guaranteed a $34,000 home loan by issuing a loan guaranty certificate to the lender and mortgagee, Oklahoma Mortgage Company, Inc. (Oklahoma Mortgage). Oklahoma Mortgage assigned the note, mortgage, and the loan guaranty certificate to Home Savings and Loan Association (Home Savings). Several years later, the borrowers defaulted, Home Savings brought a successful foreclosure suit, and the sheriff offered the mortgaged property for sale. In accordance with the VA's loan guaranty regulations governing the "sale of security," [3] the VA specified that a minimum of $30,000 would be credited to the indebtedness of the borrower on account of the value of the security sold.

Home Savings successfully bid that amount for the property at the sheriff's sale, retaining its option to resell the property to the VA.[4] Home Savings eventually did choose to convey the property to the VA for the specified amount of $30,000, and on February 24, 1975, the VA received a sheriff's deed pursuant to the order of Home Savings. On approximately this same date, the VA obtained knowledge through Oklahoma Mortgage that the signature of a borrower, Zelma R. Durham, was allegedly forged on the note and mortgage. Under VA regulations promulgated by authority of Congress, the VA incurs no liability on account of a loan guaranty if a signature in the loan papers is forged.[5] Consequently, the VA

3. The pertinent regulation of the Veterans Administration provides in part as follows:

> Upon receipt by the Administrator of notice of a judicial or statutory sale, or other public sale under power of sale contained in the loan instruments, to liquidate any security for a guaranteed or insured loan, he may specify in advance of such sale the minimum amount which shall be credited to the indebtedness of the borrower on account of the value of the security to be sold, subject to the provisions of paragraphs (a)(1), (2), (3) and (4) of this section . . . .

38 C.F.R. § 36.4320(a) (1981). The relevant portions of the VA regulations have remained unchanged since 1975. See 36 Fed.Reg. 320 (1971); 40 Fed.Reg. 34591 (1975).

4. If the holder of a VA guaranteed home loan purchases the mortgaged property at a price not in excess of the amount the VA has specified as credited toward indebtedness, then the holder may convey the property to the VA. The pertinent regulation provides as follows:

> If a minimum amount for credit to the indebtedness has been specified in relation to a sale of real property and the holder is the successful bidder at the sale for an amount not in excess of such specified amount the holder shall credit to the indebtedness the amount so specified. The holder thereupon may retain the property or not later than 15 days after the date of sale advise the Administrator of his election to convey or transfer the property, or the rights thereto derived through the sale, to the Administrator.

38 C.F.R. § 36.4320(a)(1) (1981). The amount paid by the Administrator will generally be the amount he previously specified as credited toward indebtedness. See 38 C.F.R. § 36.4320(g) (1981).

5. In the Veterans' Benefits Act, Pub.L. No. 85–857, 72 Stat. 1105 (1958) (as amended), Congress provided as follows:

> Any evidence of guaranty or insurance issued by the Administrator shall be conclusive evidence of the eligibility of the loan for guaranty or insurance under the provisions of this chapter and of the amount of such guaranty or insurance. Nothing in this section shall . preclude the Administrator from establishing, as against the original lender, defenses based on fraud or material misrepresentation. The Administrator shall not, by reason of anything contained in this section, be barred from establishing, by regulations in force at the date of such issuance or disbursement, whichever is the earlier, partial defenses to the amount payable on the guaranty or insurance.

38 U.S.C. § 1821 (1976). Pursuant to this authorization, the Administrator retained loan guarantee regulations originally promulgated under similar statutory authority in the Serviceman's Readjustment Act of 1944, 58 Stat. 284. The pertinent regulation provides as follows:

> Subject to the incontestable provisions of 38 U.S.C. 1821 as to loans guaranteed or insured on or subsequent to July 1, 1948, there shall be no liability on account of a guaranty or insurance, or any certificate or other evidence thereof, with respect to a transaction in which a signature to the note, the mortgage, or any other loan papers, or the application for guaranty or insurance is a forgery; or in which the certificate of discharge or the certificate of eligibility is counterfeited, or falsified, or is not issued by the Government.

38 C.F.R. § 36.4325(a) (1981). The Court of Appeals for the Second Circuit has held that this regulation precludes liability under a VA loan guarantee to assignees of the mortgage, as well as original lenders, if a mortgagor's signature is forged. *Century Federal Savings & Loan Association v. Roudebush,* 618 F.2d 969 (2d Cir.1980).

began an investigation into the alleged forgery, but it did not notify Home Savings of the allegations or the investigation. During the investigation, the VA processed Home Savings' claim for reimbursement on the losses incurred on the loan, and paid Home Savings the full amount of the claim, $6,733.19. However, in October 1975, the VA requested that Home Savings return this sum. The VA eventually denied Home Savings' claim for reimbursement, concluding that the signatures of Zelma Durham were indeed forgeries that nullified the loan guaranty obligation.

On the basis of these findings of fact, the district court ruled that, notwithstanding the forgery in the loan papers, the VA was obligated to Home Savings under the terms of the loan guaranty. The court held that the VA was equitably estopped from asserting the forgery defense, concluding that by accepting the sheriff's deed to the mortgaged property, and by failing to notify Home Savings of the forgery allegations, the VA induced a justifiable reliance by Home Savings that the loan guaranty claim would be honored.

## II.

The majority of this panel agrees with the district court that the VA is equitably estopped from asserting the forgery defense. The majority opinion reviews cases from the Supreme Court [6] and the Tenth Circuit [7] and concludes that "[n]one of the above mentioned cases rejecting estoppel against the government relate to facts comparable to those presented in the instant case." *Ante* at 1254. The majority suggests that the instant case involves a "commercial transaction," *ante* at 1254, and is therefore distinguishable from precedent denying equitable estoppel of the government.

Initially, I state my belief that it is insufficient to distinguish Home Savings' claim on the basis that it involves a commercial transaction, without offering some explanation of the relevance of this distinction. As Justice Marshall has noted, it only adds confusion to the already unsettled area of estoppel to delineate factual distinctions without elaborating why or how these distinctions affect the legal question involved. *Schweiker v. Hansen,* 450 U.S. 785, 792–93, 101 S.Ct. 1468, 1473, 67 L.Ed.2d 685 (1981) (Marshall, J., dissenting).

I assume that the majority considers "commercial transactions" distinguishable from other government undertakings because such transactions are in some sense "proprietary" functions.[8] However, even assuming that this ground for distinction finds support in law, I do not believe that the loan guaranty can properly be characterized as a proprietary commercial transac-

---

6. See Schweiker v. Hansen, 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981) (per curiam); INS v. Hibi, 414 U.S. 5, 94 S.Ct. 19, 38 L.Ed.2d 7 (1973) (per curiam); Montana v. Kennedy, 366 U.S. 308, 81 S.Ct. 1336, 6 L.Ed.2d 313 (1961); Federal Crop Insurance Corp. v. Merrill, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947); Utah Power & Light Co. v. United States, 243 U.S. 389, 37 S.Ct. 387, 61 L.Ed. 791 (1917).

7. See Sweeten v. Department of Agriculture Forest Service, 684 F.2d 679 (10th Cir.1982); United States v. Browning, 630 F.2d 694 (10th Cir.1980), cert. denied, 451 U.S. 988, 101 S.Ct. 2324, 68 L.Ed.2d 846 (1981); Albrechtsen v. Andrus, 570 F.2d 906 (10th Cir.), cert. denied, 439 U.S. 818, 99 S.Ct. 79, 58 L.Ed.2d 109 (1978); Atlantic Richfield Co. v. Hickel, 432 F.2d 587 (10th Cir.1970).

8. Lower federal courts have occasionally applied equitable estoppel against the government in situations where the government acts in a "proprietary capacity." See United States v. Georgia-Pacific Co., 421 F.2d 92, 100–01 & n. 17 (9th Cir.1970). See generally Note, Equitable Estoppel Against the Government, 79 Colum.L.Rev. 551, 555–57 (1979). The distinction typically is based on the rationale that the government's immunity from estoppel is an attribute of sovereignty, and therefore the government retains its immunity only so long as it acts in a sovereign capacity. Id. However, the Supreme Court has accepted neither the proprietary distinction nor its rationale. Id. at 557. Indeed, the Court has said in dicta that "the Federal Government performs no 'proprietary' functions. If the enabling Act is constitutional and if the instrumentality's activity is within the authority granted by the Act, a governmental function is being performed." Federal Land Bank v. Board of County Comm'rs., 368 U.S. 146, 150–51, 82 S.Ct. 282, 285–286, 7 L.Ed.2d 199 (1961) (footnote omitted).

tion for purposes of applying equitable estoppel against the government. The loan guaranty program is a government entitlement to veterans, see 38 U.S.C. § 1802 (1976), providing public assistance to those who have discharged a patriotic service to the country. Admittedly, the program relies on commercial institutions, such as savings and loan associations, and conventional instruments of commerce, such as loan guaranties, to accomplish its goals. However, the use of commercial institutions and instruments of commerce does not alter the essential character of the loan guaranty program; the program remains a subsidy in support of a public policy objective. Nor does the use of commercial institutions and instruments transform the government into simply "another private litigant" for purposes of equitable estoppel. Indeed, in *Federal Crop Insurance Corp. v. Merrill,* 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1948), the Supreme Court rejected such contentions, concluding that the Government's issuance of crop insurance to farmers through a federally chartered corporation could not be characterized as an ordinary commercial undertaking for the purposes of equitable estoppel.[9] 332 U.S. at 383–84 & n. 1, 68 S.Ct. at 2–3 & n. 1. I perceive no differences between the loan guaranty program for veterans and the crop insurance program for farmers that can place the former beyond *Merrill's* embrace.[10]

The majority's "commercial transaction" distinction is untenable, given the nature of the VA's loan guaranty program and the reasoning of *Merrill.* Furthermore, I antic-

ipate that the distinction will be difficult to apply. I suspect that today's adoption of this standard inaugurates a procession of future cases that will be distinguished on the basis of "finespun and capricious" characterizations. *See Indian Towing Co. v. United States,* 350 U.S. 61, 68, 76 S.Ct. 122, 126, 100 L.Ed. 48 (1955). Consequently, I decline to follow the majority's avenue of analysis and instead offer my own approach.

### III.

A court exercises its power of equitable estoppel to prevent a litigant from asserting claims or defenses that arise as a result of the litigant's own wrongdoing. The elements of equitable estoppel are described in various formulas,[11] all of which essentially require a showing of misleading conduct by one party that results in reasonable, detrimental reliance by another.

Litigants persistently have attempted to invoke the doctrine of equitable estoppel against the government, and have generated confusion and controversy in the process. When faced with the issue, the Supreme Court has repeatedly refused to estop the government, but has declined to provide guidance beyond the facts presented in each case. *See, e.g., INS v. Miranda,* —— U.S. ——, 103 S.Ct. 281, 74 L.Ed.2d 12 (1982) (per curiam); *Schweiker v. Hansen,* 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981) (per curiam); *INS v. Hibi,* 414 U.S. 5, 94 S.Ct. 19, 38 L.Ed.2d 7 (1973) (per curiam). In response, lower courts have con-

---

**9.** The Court specifically stated that "[g]overnment is not partly public or partly private, depending upon the governmental pedigree of the type of a particular activity or the manner in which the Government conducts it." 332 U.S. at 383–84, 68 S.Ct. at 2–3.

**10.** In particular, I believe that it is irrelevant that the holder of the note, rather than the veteran, asserts estoppel. Both are participants in the government's loan guaranty program. The broad reach of *Merrill* precludes the possibility that a program can have a sovereign character with respect to some participants, and a proprietary character with respect to others. *See supra* note 9.

**11.** For example, in *Sweeten v. Department of Agriculture Forest Service,* 684 F.2d 679 (10th Cir.1982), the court set out the following elements:

(1) The party to be estopped must know the facts; (2) He must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) The latter must be ignorant of the true facts; and (4) He must rely on the former's conduct to his injury.

684 F.2d at 682 n. 5. A similar six-part formulation is found in 3 J. Pomeroy, Equity Jurisprudence, § 805, at 191–92 (5th ed. Symons 1941).

tinued to apply equitable estoppel against the government, but have required a showing of additional elements or facts beyond those required for application of equitable estoppel against a private party. *See, e.g., Meister Bros. Inc. v. Macy,* 674 F.2d 1174 (7th Cir.1982); *Portmann v. United States,* 674 F.2d 1155 (7th Cir.1982). As a result, a plethora of tests have emerged for applying equitable estoppel against the government, none of which has been approved by the Supreme Court.[12]

I believe that this search by the lower courts for a talismanic test has resulted in a departure from the fundamental inquiries that underlie the doctrine of equitable estoppel. Whether a case involves the government or whether it involves private parties, the same two general questions inevitably arise: (1) did misleading conduct induce reasonable detrimental reliance? and, (2) are there nevertheless circumstances that caution the court to withhold the exercise of its equitable powers? The various proposed tests for asserting equitable estoppel against the government, including the "commercial transaction" distinction used by the majority, have diverted attention from a reasoned analysis of these inquiries, blurring the distinctions between the two questions and confounding the identification of relevant factors.

The preliminary question, whether misleading conduct has induced reasonable reliance, must be answered in light of the duties and expectations between the parties. The question remains the same whether estoppel is asserted against the government or against a private actor. However, the underlying duties and expectations that inform the inquiry may depend on the identity of the parties. In particular, dealings with the government do not necessarily support the same duties and expectations as dealings between private parties.[13] Accordingly, the allegedly misleading character of governmental conduct, as well as the reasonableness of reliance on that conduct, must be evaluated in light of duties and expectations properly attributable to the government. Of primary relevance to this evaluation are the constitutional, statutory and regulatory provisions controlling the government's conduct, interpreted in light of the nature of the government's activities and the identity of the private party.[14]

By comparison, the question of whether a court should withhold the exercise of equitable powers implicates different concerns. The courts have defined limits to the use of equitable remedies based on considerations

**12.** For example, recent tests have included distinctions between reliance on misrepresentations of procedural rather than substantive rules, *Hansen v. Harris,* 619 F.2d 942 (2d Cir. 1980), *rev'd sub nom. Schweiker v. Hansen,* 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981) (per curiam); between applications of estoppel that do and do not impact the public treasury, *Miranda v. INS,* 673 F.2d 1105 (9th Cir.1982), *rev'd,* — U.S. —, 103 S.Ct. 281, 74 L.Ed.2d 12 (1982) (per curiam); and between sovereign and proprietary activities of the government, *see Portmann v. United States,* 674 F.2d 1155, 1167–69 (7th Cir.1982) (treating the U.S. Postal Service as a "quasi-private" entity). A variety of other tests have been suggested as well over the years. *See generally* Note, *Equitable Estoppel of the Government,* 79 Colum.L.Rev. 551 (1979).

**13.** The government typically acts through congressionally created agencies whose conduct is governed by statutes and regulations and, at the outer perimeter, by the Constitution. The content of the governing law shapes the duties of the agency in its dealings with private par-

ties and the expectations of the parties in their dealings with the government. Although the governing law may subject the agencies to the same burdens as private parties, *see, e.g.,* Federal Torts Claims Act, 28 U.S.C. § 2674 (1976) (subjecting United States to tort liability "in the same manner and to the same extent as a private individual under like circumstances ...."), there is no inherent requirement that it do so. *See* 28 U.S.C. § 2680 (1976) (exempting various governmental agencies from the Federal Torts Claims Act).

**14.** I specifically note that the issue of whether the government engaged in "affirmative misconduct" is not relevant to this inquiry, since this characterization of the government's conduct does not relate to whether the conduct was misleading, or whether the conduct induced reliance. Instead, I believe the "affirmative misconduct" characterization is relevant to the second inquiry, whether the court should exercise its equitable powers. *See infra* note 17.

of fairness and the proper exercise of judicial power. *See generally* D. Dobbs, Remedies 45–65 (1973). In cases involving private parties, such considerations are reflected in the application of general principles such as the "clean hands" requirement, *Precision Instrument Manufacturing Co. v. Automotive Maintenance Machine Co.,* 324 U.S. 806, 814, 65 S.Ct. 993, 997, 89 L.Ed. 1381 (1945), and, more generally, the promotion of the "ends of justice", *Dickerson v. Colgrove,* 100 U.S. 578, 580, 25 L.Ed. 618 (1880). However, when estoppel is asserted against the government, an additional consideration arises, that of the court's relationship with the coordinate branches of government. In particular, the separation of powers doctrine may instruct courts that, absent exceptional circumstances, they should withhold the imposition of equitable estoppel against the government if the estoppel would frustrate the purpose of valid statutes expressing the will of Congress.

I believe that the Supreme Court's decisions regarding equitable estoppel of the government can be harmonized and understood by separating these two inquiries. The per curiam decisions in *INS v. Miranda,* —— U.S. ——, 103 S.Ct. 281, 74 L.Ed.2d 12 (1982) and *INS v. Hibi,* 414 U.S. 5, 94 S.Ct. 19, 38 L.Ed.2d 7 (1973), and the decision in *Montana v. Kennedy,* 366 U.S. 308, 81 S.Ct. 1336, 6 L.Ed.2d 313 (1961) seem to be decided on the basis of the initial inquiry, whether misleading conduct induced reasonable reliance. In both *Miranda* and *Hibi,* the Court's opinions suggest that the conduct of the INS was simply not misleading.[15] In *Montana,* the Court admitted that while the action of the government could have been misleading, it could not have induced reasonable reliance.[16] Since in these cases the basic requisites for equitable estoppel had not been met, there was no need to reach the second inquiry of whether the lower court should have exercised its equitable powers to estop the government.

Other Supreme Court decisions, *Schweiker v. Hansen,* 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981) (per curiam) and *Federal Crop Insurance Corp. v. Merrill,* 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947), seem to rest on this second inquiry. In these cases, the Court did not contest the claims that the government engaged in misleading conduct and induced reasonable reliance. Instead, the Court observed that a party's reliance on unauthorized or even erroneous statements of agents of the government concerning eligibility for public entitlements does not provide grounds for a court to abnegate its duty to observe the conditions provided by Congress for charging the public treasury. *See Schweiker,* 450 U.S. at 788–89, 101 S.Ct. at 1470–1471; *Merrill,* 332 U.S. at 385, 68 S.Ct. at 3–4. Thus, in these

---

**15.** In *Miranda,* an alien who married a citizen claimed that the INS was estopped from denying his application for permanent residence status because of "unreasonable delay" by the INS in processing his application. During the processing period his marriage dissolved, and his eligibility for a change in status ended. The Court declined to conclude that the delay was unwarranted, given the responsibility of the INS to fully investigate applications. —— U.S. at —— & n. 4, 103 S.Ct. at 283 & n. 4. In *Hibi,* the Court concluded that failure to publish fully the naturalization rights of aliens who served in the United States Armed Forces and to provide an authorized naturalization representative overseas was not conduct that would give rise to an estoppel against the government. 414 U.S. at 8–9, 94 S.Ct. at 21–22. A dissenting opinion in *Hibi* suggested that the failure to provide a naturalization representative was an attempt by the Executive Branch to deny aliens their right to naturalization. 414 U.S. at 11, 94 S.Ct. at 23 (Douglas, J. dissenting). However,

the Court did not discuss this assertion and apparently determined that the INS acted within the constitutional, statutory and regulatory provisions governing its operation. Thus, both *Miranda* and *Hibi* seem to be cases where the government's conduct conformed with the duties and obligations set forth by law and consequently was not misleading.

**16.** In *Montana,* an alien claimed that the United States was estopped to deny him citizenship because the American Consular Office refused to issue his mother a passport to the United States before his birth. The Court noted that the United States did not require his mother to have a passport to return to the country at that time. 366 U.S. at 314, 81 S.Ct. at 1340. Since no passport was needed, the alien's mother could not have reasonably relied on the refusal to issue the passport in deciding not to return to the United States.

cases the Court has clearly recognized the separation of powers doctrine as a ground for limiting the exercise of equitable estoppel against the government, at least in situations where unauthorized statements of government agents threaten to charge the treasury. The doctrine may limit the use of estoppel against the government in other situations as well. The Supreme Court has recently noted that lower courts should withhold estoppel in matters, such as naturalization, that do not involve the public fisc, but nevertheless, involve congressional policies "implicating broad public concern." *Miranda,* —— U.S. at ——, 103 S.Ct. at 283. Despite the broad reach of this language, the Supreme Court has also indicated that the barrier to equitable estoppel provided by the separation of powers doctrine is not absolute. The Court has repeatedly recognized that, notwithstanding the resulting interference with congressional prerogatives, equitable estoppel of the government could be permissible in exceptional circumstances, such as affirmative misconduct by agents of the government.[17] *Miranda,* —— U.S. at ——, 103 S.Ct. at 283; *Schweiker,* 450 U.S. at 788, 101 S.Ct. at 1470–1471; *Hibi,* 414 U.S. at 8, 94 S.Ct. at 21; *Montana,* 366 U.S. at 314–15, 81 S.Ct. at 1340–1341. The Court thus recognizes that some circumstances may implicate interests of sufficient importance to override the barriers to estoppel imposed by the separation of powers doctrine. Indeed, this recognition is consistent with the "pragmatic, flexible approach" that the Court has employed in resolving clashes between coordinate branches of government. *Nixon v. Administrator of General Services,* 433 U.S. 425, 442, 97 S.Ct. 2777, 2789–2790, 53 L.Ed.2d 867 (1977).

The Supreme Court cases thus reflect the following state of the law with respect to equitable estoppel of the government. At a minimum, a party asserting estoppel must show misleading conduct that induced reasonable detrimental reliance, taking into account the duties, obligations, and expectations that flow from its relationship with the government. Where this reliance is based on an unauthorized act of a government agent, the court should withhold imposition of estoppel if it would result in charging the public treasury against the will of Congress. Furthermore, the separation of powers doctrine may require courts to withhold estoppel in other situations as well. Nevertheless, equitable estoppel of the government may be permissible, notwithstanding its threat to the goals of Congress, in exceptional circumstances, such as affirmative misconduct of the government.

This perspective on the state of the law informs my view of the proper resolution of the case now before this court.

### IV.

Home Savings claims that the VA should be equitably estopped from asserting its forgery defense because the VA failed to notify Home Savings of the forgery allegations at the time that they arose. Home Savings claims that the failure to provide notification misled it into believing that its claim under a VA loan guaranty would be honored. Thus, the first inquiry, as discussed above, is whether the VA truly engaged in misleading conduct that induced reasonable detrimental reliance by Home Savings, given the duties and expectations between the parties.

Home Savings points to the VA's silence in the face of suspicion of forgery as the source of misleading conduct. Indeed, courts have long held that silence can serve as the basis of misleading conduct justify-

---

17. Although the Supreme Court has cited affirmative misconduct as providing a potential ground for imposing equitable estoppel against the government, it has not explained the relevance of this factor. In my understanding, affirmative misconduct is relevant because the executive branch has a responsibility to prevent government agents from engaging in intentional, reckless, or grossly negligent misconduct. The failure of the executive branch to prevent such misconduct provides grounds for the courts to surmount the separation of powers barrier and impose equitable estoppel. It is in that light that I understand this court's adoption of the affirmative misconduct standard in *Sweeten v. Department of Agriculture Forest Service,* 684 F.2d 679 (10th Cir.1982).

ing equitable estoppel, but only if the silent party had a duty to speak. *See, e.g., Unity Banking & Savings Co. v. Bettman,* 217 U.S. 127, 30 S.Ct. 488, 54 L.Ed. 695 (1910); *Codell v. American Surety,* 149 F.2d 854 (6th Cir.1945). Home Savings cites no legally imposed duty in the statutes and regulations which govern the VA, or in the Constitution, that requires notification of loan guaranty holders when the VA receives allegations that signatures in the loan papers are forged. Instead, Home Savings apparently believes that under some general principle of good faith,[18] the VA is obligated to disclose its suspicions of forgery prior to the completion of a conclusive investigation.

I would hesitate to rely on bare notions of good faith, completely detached from constitutional and statutory requirements, to impose such a far-reaching duty on a government agency.[19] But even assuming that this duty of disclosure existed, the VA's silence cannot be considered misleading since Home Savings apparently elected to convey the property before the VA received the forgery allegations. The facts, as found by the district court, indicate that Home Savings purchased the mortgage property at the sheriff's sale on January 28, 1975. Under VA regulations, Home Sav-

ings had 15 days, until February 12, 1975, in which to advise the VA of its election to convey the property to the VA. *See* 38 C.F.R. § 36.4320(a)(1). The VA did not receive the forgery allegations until on or about February 24, 1975, almost two weeks after the deadline for Home Savings to exercise its option to convey. Thus, at the time that Home Savings was required to make its election to convey the property,[20] the VA had no knowledge of the forgery allegations. Home Savings can hardly claim that the VA, through its silence, engaged in misleading conduct, since the VA had no reason at this time to suspect forgery. Likewise, Home Savings cannot claim that the VA engaged in misleading conduct by its failure to provide notice of the forgery allegations on the day that it received them. By that time, Home Savings had already elected to convey the property to the VA.

Since the VA did not engage in misleading conduct, there is no reason to determine the two remaining components of the first inquiry; namely, whether Home Savings' reliance was reasonable, and whether it resulted in a detriment.[21] Likewise, there is no reason to proceed to the second inquiry, whether the court should withhold the exer-

---

**18.** *Cf. Columbia Broadcast System, Inc. v. Stokely-Van Camp, Inc.,* 522 F.2d 369, 378 (2d Cir.1975) (under New York law of estoppel, the duty of a private party to disclose information may be founded on principles of ethics and good faith).

**19.** The Supreme Court has suggested in dicta that the government is subject to general principles of "good faith," saying, "[a] citizen has the right to expect fair dealing from his government." *S & E Contractors, Inc. v. United States,* 406 U.S. 1, 10, 92 S.Ct. 1411, 1417, 31 L.Ed.2d 658 (1972). However, this statement seems simply to suggest that government agencies must act within the sphere of authority provided by statute. In *S & E Contractors,* the Atomic Energy Commission (AEC) resolved a contract dispute with a private party according to the terms specified in the contract. The General Accounting Office (GAO) overturned the AEC's resolution, and the private party challenged the GAO action. The Supreme Court ruled that Congress had delegated authority to the AEC to resolve the contract dis-

pute and that the GAO had no power to interfere. 406 U.S. at 19, 92 S.Ct. at 1421–1422.

**20.** The scant record in this case does not indicate on what date the election to convey was actually made. As the party asserting estoppel, *Home Savings bore the burden of showing* misleading conduct and reasonable reliance. *See, e.g., Tom W. Carpenter Equip. Co. v. General Elec. Credit Corp.,* 417 F.2d 988, 990 (10th Cir.1969). Hence, Home Savings had to prove that the VA was apprised of the forgery allegations at the time Home Savings elected to convey the property. In the absence of evidence to the contrary from Home Savings, it should be presumed that Home Savings complied with the regulatory requirement and elected to convey the property within the fifteen day time deadline.

**21.** I note in passing that Home Savings' claim of detriment seems purely speculative. As the majority notes, Home Savings introduced no evidence *that if it retained the property it could* have sold it for more than it received from the VA.

cise of its equitable powers. Indeed, given the constitutional implications of applying equitable estoppel against a coordinate branch of government, a court should proceed with this inquiry only if it is necessary to resolve the case before it.

### V.

Home Savings has failed to demonstrate a basic requisite for equitable estoppel and, accordingly, its claim to estoppel should be denied. The majority simply overlooks this fact, and in the process determines that the government is subject to equitable estoppel because it engaged in a "commercial transaction." The commercial transaction distinction is untenable under the facts of this case, is inconsistent with Supreme Court precedent, and introduces a troublesome concept into our law. Under these circumstances, I am compelled to respectfully dissent.